**ORIGINAL**

FILED

MAR 1 9 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1  SUIHUAN CAO[1]
   A38-494-554
2  San Diego Detention Center (CCA)
   P.O. Box 439049
3  San Ysidro, CA 92143-9049

4

5

6                    **UNITED STATES DISTRICT COURT**

7                  **SOUTHERN DISTRICT OF CALIFORNIA**

8  SUIHUAN CAO,                          )  Civil Action No.
   [A38-494-554],                        )
9                                        )  **'08 CV 0511 DMS BLM**
                                         )          **PETITION**
10           Petitioner,                 )            **FOR**
                                         )  **WRIT OF HABEAS CORPUS**
11 v.                                    )
                                         )      **[28 U.S.C. § 2241]**
12 MICHAEL CHERTOFF, SECRETARY OF        )
   THE DEPARTMENT OF HOMELAND            )
13 SECURITY, MICHAEL MUKASEY,            )
   ATTORNEY GENERAL, ROBIN F. BAKER,     )
14 DIRECTOR OF SAN DIEGO FIELD OFFICE,   )
   U.S. IMMIGRATION AND CUSTOMS          )
15 ENFORCEMENT, JOHN A. GARZON,          )
   OFFICER-IN-CHARGE,                    )
16                                       )
                                         )
17           Respondents.                )
                                         )
18 _____)

19                              I.

20                      **INTRODUCTION**

21         The petitioner, Suihuan Cao, respectfully petitions this Court for a writ of habeas corpus to

22 remedy his unlawful detention.

23 _____

24      [1]The petitioner is filing this petition for a writ of habeas corpus with the assistance of Janet Tung and
   the Federal Defenders of San Diego, Inc., who drafted the instant petition. That same counsel also assisted
25 the petitioner in preparing and submitting his request for the appointment of counsel. Robin F. Baker is the
   director of the San Diego field office of U.S. Immigration and Customs Enforcement. He administers
26 federal immigration laws on behalf of the Secretary of Homeland Security in the federal judicial district for
   the Southern District of California. In Mr. Baker's capacity as the director of the local office of U.S.
27 Immigration and Customs Enforcement, he has immediate control and custody over the petitioner. John A.
   Garzon is the officer in charge of the detention facility holding the petitioner.
28



1   Petitioner is in the custody of the Secretary of the Department of Homeland Security and the

2   Attorney General of the United States and their employees (hereinafter "respondents").  He is detained at

3   the respondents' detention facility in San Diego, California, under the control of the officer in charge.

4   **II.**

5   **JURISDICTION AND VENUE**

6   This Court has jurisdiction under 28 U.S.C. §§ 1331, 2241(c)(1) and (3), and U.S. Const. art.

7   I., § 9, cl. 2, because the petitioner is being unlawfully detained as a result of U.S. Immigration and Customs

8   Enforcement's misapplication of the provisions of 8 U.S.C. § 1231(a)(6).  See Zadvydas v. Davis, 533 U.S.

9   678, 686-90 (2001).  Moreover, his detention violates the Constitution, the laws, and the treaties of the

10  United States.  See Magana-Pizano v. INS, 200 F.3d 603, 610 (9th Cir. 2000); Goncalves v. Reno, 144 F.3d

11  110, 123 (1st Cir. 1998).  Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471, 482-83

12  (1999), makes clear that the petitioner's habeas petition is not barred by 8 U.S.C. § 1252(g).

13  Venue is proper in this district because the petitioner is detained here.  See 28 U.S.C. § 2241,

14  et. seq., and 28 U.S.C. § 1391(e).

15  **III.**

16  **BACKGROUND**

17  Petitioner, a native of China, entered the custody of Respondents over nine months ago, on or

18  about June 8, 2007, where he has remained since.  He was ordered removed from the United States by an

19  Immigration Judge on October 2, 1995; the Board of Immigration Appeals (BIA) affirmed the decision on

20  March 24, 1997.  He is being held in detention by Respondents based upon their misapplication of 8 U.S.C.

21  § 1231(a)(6) to indefinitely detain non-removable aliens.

22  The petitioner was born in 1970 in Canton, China.  In 1983, at age 13, he left for the United

23  States, entering as a legal permanent resident under the sponsorship of his grandfather.  Petitioner was

24  ordered removed to China by an immigration judge on October 2, 1995.  Petitioner's order of removal

25  became adminstratively final as of March 24, 1997, after the BIA dismissed his appeal.  See 8 C.F.R. §

26  1241.1; see also 8 C.F.R. § 1240.15.  Petitioner's removal period commenced as of March 24, 1997.  See

27  8 U.S.C. § 1231(a)(1)(B) (i).  ("The removal period begins on the latest of the following: . . . The date the

28  order of removal becomes administratively final.").

2

1    Petitioner was most recently taken from his home into the custody of immigration officials

2  on or about June 8, 2007, and has remained in their continuous custody for the nine months since. Prior to

3  the administrative finality of his removal order, Petitioner had previously been taken into custody and

4  released on bond in or about 1993. Petitioner has been under a final order of removal since March 24,

5  1997—for nearly eleven years. In that eleven year period, Respondents have not obtained the travel

6  documents necessary for his removal.

7    In the nine month period Petitioner has been in their custody to date, Respondents have failed

8  to conduct the custody review required by regulation, see 8 C.F.R. § 241.4(k)(1)(i), within the 90-day

9  removal period. See 8 U.S.C. § 1231(a)(1). Instead, on January 23, 2008, seven months after they detained

10  Petitioner, and over four months after the required review, Respondents issued an order to continue detention

11  on that date. See Appendix A, attached hereto. The order recommended detention on the ground that: "By

12  the time of your 20th birthday [in 1990] you had already been convicted of four serious felony crimes.

13  Several years later you were again convicted of three serious felony crimes. You have demonstrated a

14  flagrant disregard for the laws of the United States as well as for the lives of the general public." Id. The

15  order made no claim that Petitioner was presently a flight risk or danger to the community. See id. The

16  order made no mention of any progress in obtaining travel documents for petitioner. See id. The order

17  further stated that if Petitioner was not "released or removed from the United States by April 14, 2008,

18  jurisdiction of the custody decision in your case will be transferred to the Headquarters Post Order Unit

19  (HQPDU), 801 I St. NW, Washington, DC 20536. HQPDU will made a final determination regarding your

20  custody." Id. To date, Petitioner has received no further communication regarding his custody status, and

21  does not know whether HQPDU has made a determination of his status.

22    Over nine months have elapsed since Petitioner was in custody under a final order of removal

23  and subject to removal. At no time during these past nine months, or in the eleven years since Petitioner's

24  removal order was administratively final has the United States government received travel documents that

25  would permit his repatriation to China. See 8 U.S.C. § 1231(b)(2)(A), (D), (E)(iv)-(vi) (deportable alien

26  must be removed first to country designated by him at deportation hearing, then to country of citizenship,

27  then to listed countries, including the country of birth or that country having sovereignty over it at time of

28  the alien's birth or at time of the deportation). Neither have Respondents given any indication why, after

3

1   eleven years, Petitioner has suddenly been taken from his home into immigration custody. As the Chinese

2   government has not issued travel documents in the eleven years since Petitioner has been subject to a final

3   order of removal, it is extremely unlikely that its government will issue travel documents to permit his

4   removal there in the reasonably foreseeable future. Neither have Respondents obtained travel documents

5   that would permit his removal to any other country. Thus, the United States has had ample opportunities

6   to obtain travel documents, yet has failed to do so. There is therefore no indication that the petitioner can

7   removed to China, or any other country, in the reasonably foreseeable future.

8                                              **IV.**

9                                           **ARGUMENT**

10   **THIS COURT MUST RELEASE THE PETITIONER FROM THE CUSTODY OF THE
     RESPONDENTS UNDER APPROPRIATE CONDITIONS OF SUPERVISION.**

11

12           Federal law requires the Attorney General to remove a deportable alien from the United States

13   within a ninety-day period after an immigration judge's order of removal becomes administratively final.

14   See 8 U.S.C. § 1231(a)(1); see also Ma v. Ashcroft, 257 F.3d 1095, 1104 (9th Cir. 2002). During the ninety-

15   day removal period, the alien must be detained in custody. See 8 U.S.C. § 1231(a)(2).

16           If the Attorney General cannot remove the alien within the statutory removal period, the

17   Attorney General can release the person in question under appropriate conditions of supervision, including

18   regular appearances before an immigration officer, travel restrictions, and medical or psychiatric

19   examinations, among other requirements. See Ma, 257 F.3d at 1104; see also 8 U.S.C. § 1231(a)(3) (listing

20   the conditions of supervision for deportable or removable aliens released from immigration custody at the

21   expiration of the ninety-day removal period). The Attorney General may detain a deportable or inadmissible

22   alien beyond the ninety-day removal period, however, when he determines that the person in question would

23   "be a risk to the community or unlikely to comply with the order of removal" if released from immigration

24   custody. 8 U.S.C. § 1231(a)(6).

25           In Zadvydas v. Davis, 533 U.S. 678, 689 (2001), the Supreme Court held that 8 U.S.C.

26   § 1231(a)(6) only authorizes a period of detention that is reasonably necessary to bring about an alien's

27   removal from the United States, and "does not permit indefinite detention." If a deportable alien has not

28   been released from immigration custody within a six-month period after the issuance of a final order of

                                                  4

1 | removal or deportation, "the habeas court must ask whether the detention in question exceeds a period

2 | reasonably necessary to secure removal." Id. at 699; see also Ma, 257 F.3d at 1102 n.5 (declaring that in

3 | Zadvydas, "the Supreme Court read the statute to permit a 'presumptively reasonable' detention period of

4 | *six months* after a final order of removal–that is, *three months* after the statutory removal period has ended

5 | . . . . .") (emphasis in original).  When a deportable alien "provides good reason to believe that there is no

6 | significant likelihood of removal in the reasonably foreseeable future, the Government must respond with

7 | evidence sufficient to rebut that showing." Zadvydas, 533 U.S. at 701.  Federal officials **must** release a

8 | deportable alien from custody under appropriate conditions of supervision when no "significant likelihood

9 | of removal [exists] in the reasonably foreseeable future." Id.; see also Ma, 257 F.3d at 1100 (concluding

10 | that federal law does not permit the Attorney General to hold someone "for more than a reasonable period"

11 | beyond the ninety-day statutory removal window, and mandates release of the alien under 8 U.S.C.

12 | § 1231(a)(3), when the alien "has already entered the United States and there is no reasonable likelihood that

13 | a foreign government will accept the alien's return in the reasonably foreseeable future . . . .").

14 |    The petitioner has been detained in the custody of respondents since **June 8, 2007**, and has

15 | spent over nine months in immigration custody.  In the eleven years' time since the order of removal became

16 | completely final on March 24, 1997, the United States government has not received travel documents that

17 | would permit the petitioner's repatriation to China. There is no indication that the petitioner can be removed

18 | to that country in the reasonably foreseeable future. Indeed, the Department of Homeland Security ("DHS")

19 | has specifically identified China as a country notorious for delay in approving physical removals.  See

20 | Appendix B, excerpts from Department of Homeland Security, Office of the Inspector General, Detention

21 | and Removal of Illegal Aliens, OIG 06-33 (April 2006), at 17, available at

22 | www.jrsusa.org/docs/OIG_06-33_Apr06.pdf [hereafter "April 2006 OIG Report"]. In its April 2006 report,

23 | the DHS Office of the Inspector General ("OIG") listed China as one of a handful of countries known for

24 | "imposing a slow and problematic travel document process" that "delay[s] the removal process." Id.

25 | (describing "Countries Blocking or Inhibiting Repatriation of Illegal Aliens").  In February 2007, the OIG,

26 | in a study of ICE's compliance with detention, characterized China as a country to which "removals are

27 | possible, but difficult" due to "long delays" or "sporadic[]" provision of travel documents due to "internal

28 | political circumstances or diplomatic pressure from the United States." See Appendix C, excerpts from

5

1  Department of Homeland Security, Office of the Inspector General, <u>ICE's Compliance With Detention</u>

2  <u>Limits for Aliens With a Final Order of Removal From the United States</u>, OIG-07-28 (Feb. 2007), at 12,

3  <u>available at</u> www.dhs.gov/xoig/assets/mgmtrpts/OIG_07-28_Feb07.pdf, [hereafter "February 2007 OIG

4  Report"].   The February 2007 OIG report found that 63% of Chinese citizens in the examined sample

5  continued to remain in prolonged detention beyond the removal period due to unexplained circumstances

6  that defied political expectations: In one example, "China had agreed during negotiations with the United

7  States to accept a charter flight of its nationals, but then delayed the flight several times." <u>Id.</u> at 12; <u>see also</u>

8  <u>id.</u> (32 of 246 Chinese in detention in March 2006 had been detained for over 360 days).

9  The ninety day statutory removal period for Petitioner under 8 U.S.C. § 1231 ended on **September 6, 2007,**

10  over six months ago.

11  The <u>Zadvydas</u> court erected a "presumptively reasonable" six-month detention period during

12  which the federal government should attempt to accomplish all reasonably foreseeable removals pursuant

13  to 8 U.S.C. § 1231.  <u>Zadvydas</u>, 533 U.S. at 701; <u>see also Ma</u>, 257 F.3d at 1102 n.5.  The six-month period

14  expired long ago on **December 8, 2007**.  Petitioner's detention beyond the presumptively reasonable

15  detention period announced in <u>Zadvydas</u> violates §1231(a)(6), because it is not significantly likely that the

16  petitioner can be removed to China in the reasonably foreseeable future.  <u>See Zadvydas</u>, 533 U.S. at 700;

17  <u>see also Ma</u>, 257 F.3d at 1112 (holding that section 1231 mandates the release of deportable aliens "at the

18  end of the presumptively reasonable detention period" when "there is no repatriation agreement and no

19  demonstration of a reasonable likelihood that one will be entered into in the near future . . . .").  Therefore,

20  the petitioner **must** be released under the conditions set out in §1231(a)(3).  <u>See Zadvydas</u>, 533 U.S. at 700-

21  01.

22  <center>**V.**</center>

23  <center>**REQUESTED RELIEF**</center>

24  The petitioner requests that this Court order the respondents to release him from custody under

25  the conditions of supervision set forth in 8 U.S.C. §1231(a)(3).

26  //

27  //

28  //

<center>6</center>

# VI.

## VERIFICATION

I, Suihan Cao, hereby verify that the facts contained in the instant petition are true and correct.

Respectfully submitted,

Dated: 3/15/08

SUIHAN CAO
Petitioner

7

# APPENDIX A

*ATTN: Janet C Tung*



Office of Detention and Removal Operations
San Diego Field Office

**U.S. Department of Homeland Security**
880 Front Street
San Diego, California 92101

**U.S. Immigration
and Customs
Enforcement**

CAO, Sui Huan                                                        A 38 494 554
C/O Corrections Corporation of America
Otay Detention Facility
446 Alta Road, Suite 5400
San Diego, California 92158

## Decision to Continue Detention

This letter is to inform you that your custody status has been reviewed and it has been determined
that you will not be released from the custody of U.S. Immigration and Customs Enforcement (ICE)
at this time. This decision has been made based on a review of your file and/or your personal
interview and consideration of any information you submitted to ICE's reviewing officials.

*Information from your immigration file reveals the following: You arrived in the United States in
1983, at the age of 13. By the time you reached your 20th birthday you had already been convicted
of four serious felony crimes. Several years later you were again convicted of three serious felony
crimes. You have demonstrated a flagrant disregard for the laws of the United States as well as for
the lives of the general public. For the reasons stated above, ICE has found that it would not be in
the best interests of the general public to release you at this time.*

Based on the above, you are to remain in ICE custody pending your removal from the United States.
You are advised that you must demonstrate that you are making reasonable efforts to comply with
the order of removal, and that you are cooperating with ICE's efforts to remove you by taking
whatever actions ICE requests to effect your removal. You are also advised that any willful failure
or refusal on your part to make timely application in good faith for travel or other documents
necessary for your departure, or any conspiracy or actions to prevent your removal or obstruct the
issuance of a travel document, may subject you to criminal prosecution under 8 USC Section
1253(a).

If you have not been released or removed from the United States by <u>April 14, 2008</u>, jurisdiction of
the custody decision in your case will be transferred to the Headquarters Custody Determination
Unit (HQCDU), 801 I St. NW, Washington, DC 20536. HQCDU will make a final determination
regarding your custody.

_____                    1/23/8
Signature and Title of Deciding Official               Date

Culley
Tel: 619-557-6192.

# APPENDIX B

DEPARTMENT OF HOMELAND SECURITY

# DEPARTMENT OF HOMELAND SECURITY

# Office of Inspector General

## DETENTION AND REMOVAL
## OF
## ILLEGAL ALIENS

U.S. Immigration and Customs Enforcement (ICE)



## Office of Audits

**OIG-06-33**

**April 2006**

*Office of Inspector General*

U.S. Department of Homeland Security
Washington, DC 20528



April 14, 2006

Preface

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the Homeland Security Act of 2002 (*Public Law 107-296*) by amendment to the Inspector General Act of 1978. This is one of a series of audit, inspection, and special reports prepared as part of our oversight responsibilities to promote economy, efficiency, and effectiveness within the department.

This report assesses DHS's Immigration and Customs Enforcement program for detaining and removing illegal aliens apprehended in the United States and at ports of entry. It is based on interviews with employees and officials of relevant agencies and institutions, direct observations, and a review of applicable documents.

The recommendations herein have been developed to the best knowledge available to our office, and have been discussed in draft with those responsible for implementation. It is our hope that this report will result in more effective, efficient, and economical operations. We express our appreciation to all of those who contributed to the preparation of this report.

*Richard L. Skinner*

Richard L. Skinner
Inspector General

compared to 52,890 who failed to appear during FY 2004, a 26 percent increase.

**Propensity of Illegal Aliens With Final Orders to Abscond.** Based on past history, the vast majority of illegal aliens who are released that are later issued final orders of removal by the EOIR will abscond. This is because DRO lacks the trained personnel, infrastructure, and funding needed to detain all apprehended aliens while their immigration status is being adjudicated. For example, DRO statistics indicate that 73 percent of the immigration cases for released illegal aliens brought before the immigration judge resulted in the issuance of final orders of removal. According to DRO, 85 percent of the illegal aliens released that have been issued final orders of removal, will abscond. Between FY 2002 and FY 2004, 280,987 illegal aliens were released of which 174,212 are likely to abscond based on past statistics. As of December 30, 2005, there were more than 544,000 absconders in the U.S.[36]

**Countries Blocking or Inhibiting Repatriation of Illegal Aliens.** Thousands of criminal aliens with final orders are released because of the unwillingness of some countries to issue travel documents necessary for repatriation.[37] These countries employ a variety of means to delay the removal process. For example, Ethiopia will only issue travel documents to persons who prove that their parents were born in Ethiopia, provide proof of birth in Ethiopia, are able to speak the language, and prove that they have family still residing in Ethiopia today. Eritrea will not grant the requisite travel documents to any individual who was not issued a "blue identity card" or a passport that was obtained after Eritrea gained its independence from Ethiopia in 1991.

Other methods for blocking repatriation include:

- requiring illegal aliens to produce overwhelming documentary evidence of their nationality (Iran);
- imposing a slow and problematic travel document issuance process (Iran, China, Jamaica, India);
- limiting the number of travel interviews being conducted (Ethiopia);
- refusing to repatriate nationals (Laos and Vietnam).

As a result of these barriers to removal, DRO is being forced to devote a significant percentage of its funded detention bed space (14%) to illegal aliens whose countries are either slow and/or unwilling to issue travel documents needed for removal. During FY 2003, the detention of criminal/non-criminal aliens from the top eight uncooperative countries that block or inhibit repatriation consumed 981,202 detention days and $83 million.[38] Table 13

---

[36] Includes officially designated absconders, unexecuted orders estimated to be absconders but not officially designated as such, and unconfirmed voluntary departures.

[37] These countries include Ethiopia, Eritrea, China, India, Iran, Jamaica, Laos. And Vietnam,

[38] The equivalent of 2,688 detention beds or 14 percent of the 19,444 funded bed space authorized during FY 2003.

contains a breakdown of FY 2003 detention days and estimated resources devoted to illegal aliens from eight countries that block or inhibit the repatriation of illegal aliens issued final orders of removal.

| Table 13 Breakdown of FY 2003 Detention Days and Estimated Resources Devoted to Aliens From Eight Countries That Block or Inhibit Repatriation | | |
|---|---|---|
| **Eight Countries** | **Detention Days FY 2003** | **Estimated Annual Cost @ ($85/day)** |
| Vietnam | 137,280 | $11,668,800 |
| Jamaica | 241,114 | $20,494,690 |
| Iran | 42,884 | $ 3,641,740 |
| India | 99,482 | $ 8,455,970 |
| Ethiopia | 34,761 | $ 2,954,685 |
| Eritrea | 6,401 | $    544,085 |
| China | 366,540 | $31,155,900 |
| Laos | 52,740 | $ 4,482,900 |
| **Total** | **981,202** | **$83,398,770** |

Source: DRO

The difficulty that DRO is experiencing removing illegal aliens with final orders has, in effect, created a mini-amnesty program for tens of thousands of illegal aliens that are subject to removal from the U.S. It also encourages individuals from non-cooperating countries such as China, India, and Iran to make attempts to enter the U.S. illegally. As of June 2004, more than 133,662 illegal aliens with or pending final orders of removal had been apprehended and released into the U.S. and who are unlikely to ever be repatriated if ordered removed because of the unwillingness of their country of origin to provide the documents necessary for repatriation. Table 14 contains a breakdown of the detained/non-detained aliens from eight countries that block or inhibit the repatriation of its citizens from the U.S.

# APPENDIX C

# DEPARTMENT OF HOMELAND SECURITY

# Office of Inspector General

# ICE's Compliance With Detention Limits for Aliens With a Final Order of Removal From the United States



OIG-07-28                                                    February 2007



*Office of Inspector General*

**U.S. Department of Homeland Security**
Washington, DC 20528

February 9, 2007

Preface

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the Homeland Security Act of 2002 (*Public Law 107-296*) by amendment to the Inspector General Act of 1978. This is one of a series of audit, inspection, and special reports prepared by our office as part of our oversight responsibilities to promote economy, effectiveness, and efficiency within the department.

This report assesses Immigration and Customs Enforcement's (ICE) compliance with U.S. Supreme Court rulings and ICE's implementation of regulations on the detention of aliens with a final order of removal. This report is based on interviews with employees of relevant government agencies and *pro bono* organizations, file reviews, and direct observation and statistical analysis.

Our recommendations were developed based on the information available to our office. The draft recommendations were discussed with those responsible for implementation. We hope that this report will result in more effective, efficient, and economical operations. We appreciate all of those who contributed to the preparation of this report.

Richard L. Skinner
Inspector General

detention in March 2006, only 55 (4%) were still detained in June 2006, and most had been returned to Honduras. Only 2 of 1,323 Hondurans had been in detention more than 360 days.

**Chart 1: Detention Rates By Country Of Origin**



Source: DACS, OIG Analysis

In contrast, as depicted in Chart 1, the sharp decline in the number of detained Cubans, Laotians, Cambodians, and Vietnamese, reflects ICE DRO's recognition that there is usually no significant likelihood that the governments of these countries will issue travel documents for their nationals. Therefore, most aliens from these counties must eventually be released within the United States unless the stringent regulatory standards for special circumstances can be met. ICE deportation officers said that most aliens from these countries are released within the United States after 90 days. If aliens from these countries are a violent threat to the community, but do not meet the stringent standard for special circumstances cases, most are released within the United States after 180 days. For example, in March 2006 there were 203 Cubans in detention, and by June 2006 all but 28 (14%) of this group were no longer in detention, most released within the United States. Only 2 of 203 Cubans had been in detention more than 360 days. These figures, based on DACS POCR reports, do not include Cubans paroled into the United States from the 1980 Mariel boatlift, as Mariel Cubans are tracked separately in DACS.

Finally, as depicted in Chart 1, the high detention rates among Indians, Haitians, Pakistanis, and Chinese, reflect that removals are possible, but difficult, for these nationalities. Deportation officers said that these countries either provide travel documents routinely after long delays, or provide them sporadically based on internal political circumstances or diplomatic pressure from the United States. For example, in March 2006 there were 246 Chinese in detention. By June 2006, 156 (63%) were still detained because China had agreed during negotiations with the United States to accept a charter flight of its nationals, but then delayed the charter several times. Of the 246 Chinese nationals detained in March 2006, 32 had been in detention more than 360 days. During our fieldwork, ICE deportation officers informed us that the United States government had reached agreements with the governments of China, India, and Haiti to authorize the return of a substantial number of nationals from these countries and that some detained aliens had already been removed.

As shown in Appendix E: Detentions Past 360 Days the correlation between countries that are slow to produce travel documents and the length of detention some aliens experience was most apparent when we examined detention rates for the group of 428 aliens who had been detained for more than 360 days as of June 2006. Reasons for the longer detention rates among the group of 428 vary, and might include the alien's failure to comply, or a court's grant of a stay of removal. The longer detention rates might also result from an expected removal that does not occur or a belief that travel documents

will be issued in a reasonable period of time.  However, very few of the 428
aliens were formally certified as special circumstances cases, the four
categories of cases for which continued detention is justified to protect the
public or the national interest.  For example, only 36 cases were held as
"specially dangerous."  No cases, however, were certified under the remaining
three categories, as having a highly contagious disease, or a potentially
adverse affect on national security, or the national interest if released.  See
Appendix F:  Special Circumstances Cases for more information on DHS'
certifications.

## Inconsistent Use of Available Guidance and Resources by Field Offices Contributes to Compliance Issues

To determine whether the detention of aliens with a final order complies with
Supreme Court decisions, regulations and ICE guidance, we reviewed a
sample of alien files at each of the seven DRO offices where we conducted
site visits.  We determined that post-order custody reviews were not
consistently conducted, and that required notifications and reviews were not
consistently complete or timely.  While the HQCDU has developed and
posted on its website extensive guidance, not all field offices visited were
using the materials.  The most serious consequence was that some detainees
were deemed to have failed to comply, and therefore removed from the POCR
process, without sufficient justification.  For more information on field offices
selected for site visits and our sample of alien files reviewed, see Appendix A.

### Post-Order Custody Reviews Are Not Consistently Conducted

Of the 210 alien files we examined, 82 were eligible for a post-order custody
review.  We determined that 11 of these 82 aliens had not received a 90-day
post-order custody review, and 3 had not received either a 90-day or 180-day
review.  Case completion rates varied widely by field office as depicted in
Figure 1 and Table 2, which illustrate the disposition of the sample files.

⬩JS 44  (Rev. 3/99)    **ORIGINAL**    **CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 19~~ ~~ required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**FILED**

**MAR 19 2008**

**CLERK, U.S. DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**
                                    **DEPUTY**

**I. (a) PLAINTIFFS**

Suihuan CAO

San Diego Detention Center (CCA), P.O. Box 439049

San Ysidro, CA  92143

**(b)** County of Residence of First Listed Plaintiff    SAN DIEGO
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**

Michael Chertoff, et al

County of Residence of First Listed ~~ ~~
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
       LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Pro Se    **'08 CV 0511 DMS BLM**

Attorneys (If Known)    (619) 557-5662

KAREN P. HEWITT, U.S. ATTY

ATTN:  CIVIL PROCESS CLERK

880 FRONT STREET, SAN DIEGO, CA  92101

**II. BASIS OF JURISDICTION**    (Place an "X" in One Box Only)

☐ 1  U.S. Government
     Plaintiff

☒ 2  U.S. Government
     Defendant

☐ 3  Federal Question
     (U.S. Government Not a Party)

☐ 4  Diversity
     (Indicate Citizenship of Parties
     in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                      and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT**    (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product / Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability / ☐ 365 Personal Injury— | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & / Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander / ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability / Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine / **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product / ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability / ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle / Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability / ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of |
| ☐ 220 Foreclosure | ☐ 442 Employment / Sentence | ☐ 740 Railway Labor Act | | Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ / Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee Determination |
| ☐ 240 Torts to Land | Accommodations / ☒ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Under Equal Access to |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 535 Death Penalty | | | Justice |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights / ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS— Third Party | ☐ 950 Constitutionality of |
| | / ☐ 550 Civil Rights | Security Act | 26 USC 7609 | State Statutes |
| | / ☐ 555 Prison Condition | | | ☐ 890 Other Statutory Actions |

**V. ORIGIN**    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original
     Proceeding

☐ 2  Removed from
     State Court

☐ 3  Remanded from
     Appellate Court

☐ 4  Reinstated or
     Reopened

☐ 5  Transferred from
     another district
     (specify)

☐ 6  Multidistrict
     Litigation

☐ 7  Appeal to District
     Judge from
     Magistrate
     Judgment

**VI. CAUSE OF ACTION**    (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. § 2241

**VII. REQUESTED IN**    ☐ CHECK IF THIS IS A CLASS ACTION
**COMPLAINT:**             UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes  ☐ No

**VIII. RELATED CASE(S)**    (See instructions):
**IF ANY**

JUDGE                      DOCKET NUMBER

DATE                      SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 148944    AMOUNT $500    APPLYING IFP    JUDGE    MAG. JUDGE

SU 3/19/08

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

## # 148944    — SH

## March 19, 2008
## 15:21:44

## Habeas Corpus
USAO #.: 08CV0511
Judge..: DANA M SABRAW
Amount.:                    $5.00 MO
Check#.: 11877220844


## Total—>  $5.00


FROM: CAO V. CHERTOFF