KAREN P. HEWITT
United States Attorney
RAVEN M. NORRIS
Assistant U.S. Attorney
California State Bar No. 232868
CAROLINE J. CLARK
Assistant U.S. Attorney
California State Bar No. 220000
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7157/7491
Facsimile: (619) 557-5004

Attorneys for Respondents

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUI HUAN CAO, | Case No. 08cv0511-DMS (BLM) |
| Petitioner, | |
| v. | GOVERNMENT'S RETURN IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS |
| MICHAEL CHERTOFF, Secretary of the Department of Homeland Security; MICHAEL MUKASEY, Attorney General; ROBIN F. BAKER, Director of San Diego Field Office; U.S. Immigration and Customs Enforcement; JOHN A. GARZON, Officer-in-Charge, | |
| Respondents. | |

I. INTRODUCTION

Petitioner requests that this Court release him from government custody by granting his request for a writ of habeas corpus. Petitioner's request should be denied because he cannot demonstrate that there is no significant likelihood of his removal in the reasonably foreseeable future. Petitioner is subject to a final order of deportation, and ICE is usually successful in obtaining travel documents for Chinese citizens. There is no dispute that Petitioner is a Chinese citizen, but the Chinese Consulate has expressed reluctance to issue travel documents because of Petitioner's ties to the U.S. Petitioner has the ability to obtain travel documents on his own to return to China. Given these considerations ICE Headquarters is now deciding whether to continue Petitioner's detention. Under such circumstances, this Court should deny the writ.

## II. FACTUAL BACKGROUND

On April 30, 1993, the Immigration and Naturalization Service (INS)[1] issued an Order to Show Cause (OSC) and Notice of Hearing (Form I-221) to Sui Huan Cao (Petitioner). See Exhibit (Exh.) A. The OSC alleged that Petitioner was a native and citizen of China who entered the United States on or about December 23, 1993 as a lawful permanent resident. Id. The OSC further alleged that on February 5, 1990, Petitioner was convicted of violating New York Penal Code § 110/160.10, for attempted robbery in the second degree, and on August 7, 1990, Petitioner was convicted of violating New York Penal Code § 160.15, for robbery in the first degree. Id. The OSC charged that Petitioner was subject to deportation pursuant to 8 U.S.C. § 1251(a)(2)(A)(ii) (1993) (now codified at 8 U.S.C. § 1227(a)(2)(A)(ii)) for having been convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct at any time after entry. Id.

On April 4, 1994, the INS set a bond of $30,000 for Petitioner's release pending the a final outcome of his deportation proceedings. See Exh B. On April 6, 1994, pursuant to Petitioner's request for bond redetermination, the Immigration Court conducted a bond hearing and set a $15,000 bond for Petitioner. See Exh. C. On April 7, 1994, Petitioner was released from INS custody after International Fidelity Insurance Company posted the $15,000 bond. See Exh. D at ¶ 4; Exh. E

On May 27, 1994, Petitioner appeared at his deportation hearing. See Exhibit F at 32. Petitioner admitted the allegations in the OSC and conceded deportability.[2] Id. at 33-34. Petitioner designated China as the country to which he should be deported and indicated that he would apply for relief from deportation in the form of an application for a waiver of deportation pursuant to the former 8 U.S.C. § 1182(c) which was subsequently repealed. Id. at 35. On October 2, 1995, the Immigration Judge (IJ) conducted a hearing on Petitioner's application for a waiver of deportation and after a hearing rendered an oral decision denying relief and ordering Petitioner deported to China. See Exh. G.

---

[1] As of March 1, 2003, the INS was reorganized with the creation of the Department of Homeland Security (DHS). The entity within INS that prosecuted removal and deportation proceedings and that is currently detaining Petitioner is now called U.S. Immigration and Customs Enforcement (ICE).

[2] Petitioner denied the allegation in the OSC that alleged his convictions did not arise out of a single scheme of criminal misconduct, but by conceding deportability, he effectively admitted the allegation.

1        On October 11, 1995, Petitioner, through counsel, filed an appeal of the IJ's decision to the
2  Board of Immigration Appeals (BIA). <u>See</u> Exh. H. On March 24, 1997, the BIA dismissed Petitioner's
3  appeal. <u>See</u> Exh. I.  On April 1, 1998, INS issued a Warrant of Removal/Deportation Form I-205)
4  commanding the custody and removal of Petitioner based on the final deportation order. <u>See</u> Exh. J.
5  On July 2, 1999, the INS demanded that the surety on Petitioner's $15,000 surrender Petitioner to INS
6  on August 6, 1999. <u>See</u> Exh. K.  Petitioner did not surrender to INS authorities on August 6, 1999, or
7  thereafter.

8        On June 5, 2007, ICE officers located Petitioner and discovered that he was a fugitive wanted
9  by the INS since March 24, 1997.  <u>See</u> Exh. L.  Petitioner was taken into ICE custody and on
10 July 24, 2007, was transferred to the ICE detention facility in San Pedro, California. <u>See</u> Exh. D at ¶ 8.
11 Petitioner was provided with instructions regarding his requirement to assist in obtaining travel
12 documents. <u>Id.</u>  On August 31, 2007, Petitioner was transferred to ICE custody in San Diego.  <u>Id.</u>

13       On November 28, 2007, ICE sent a request for travel documents for Petitioner to the Chinese
14 Consulate in Los Angeles. <u>Id.</u>; Exh. M.  On January 14, 2008, Deportation Officer Miguel Coronado
15 conducted a Post Order Custody Review Worksheet for Petitioner and recommended that Petitioner
16 remain in custody due to his violent criminal history and in consideration of the fact that he had been
17 a fugitive from deportation for over ten years. <u>See</u> Exh N; Exh. D at ¶ 11.  On January 23, 2008, ICE
18 issued a Decision to Continue Detention, noting Petitioner's criminal history and disregard for law. <u>See</u>
19 Exh. O.

20       On February 1 and 19, 2008, ICE contacted the Chinese Consulate again requesting that travel
21 documents be issued for Petitioner. <u>See</u> Exh. D at ¶ 12.  Also on February 19, 2008, the local ICE office
22 sent a memorandum to ICE Headquarters in Washington, D.C., requesting assistance in obtaining
23 Petitioner's travel documents. <u>Id.</u>; Exh. P.  On February 20, 2008, Petitioner was interviewed by a
24 consular official and informed the official that his attorney was going to reopen his immigration
25 proceedings. <u>See</u> Exh. D at ¶ 13.  The consular official informed ICE that the consulate would not issue
26 travel documents until ICE could verify that Petitioner was not going to reopen his case.  <u>Id.</u>
27 Deportation Officer Coronado was subsequently informed by Petitioner's counsel, Janet Tung, that no
28 motion to reopen was going to be made. <u>Id.</u> at ¶ 15.  On March 3, 2008, the Chinese Consulate informed

ICE that the application for Petitioner's travel documents had been submitted to mainland China for approval. Id. at ¶ 17.

On March 17, 2008, April 3, 2008, and April 7, 2008, ICE contacted the Chinese Consulate requesting the status of Petitioner's travel documents. Id. at ¶ 18. On April 18, 2008, ICE point of contact for the Chinese Consulate, Eric Saldana, met with a consular official and was informed that the consulate was hesitant to issue a travel document to Petitioner because of humanitarian factors. See Exh. Q at ¶ 3. On April 28, 2008, Petitioner's case was transferred to ICE's Headquarters Custody Determination Unit in Washington, D.C., for a final determination regarding Petitioner's custody and continued negotiation with the Chinese Consulate for Petitioner's travel documents. See Exh. D at ¶ 19. Currently, the parties await ICE Headquarters determination regarding continued negotiation with China.

### III. LEGAL BACKGROUND

Congress has mandated that an alien ordered removed be detained for 90 days for the government to have adequate time to secure the alien's removal through negotiations with foreign governments. See 8 U.S.C. § 1231 (the Attorney General "shall detain" the alien during the 90 day removal period); see also Zadvydas v. Davis, 533 U.S. 678, 683 (2001). Pursuant to 8 U.S.C. § 1231(a)(6), aliens such as Petitioner, who are removable under 8 U.S.C. § 1227, can be held beyond the normal 90-day removal period. Section 1231(a)(6) provides:

> An alien ordered removed who is inadmissible under section 1182 [8 U.S.C. § 1182], removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph 3 [8 U.S.C. § 1231(a)(3)].

However, the statute "limits an alien's post-removal-period detention to a period reasonably necessary to bring about the alien's removal from the United States" and does not permit "indefinite detention." Zadvydas, 533 U.S. at 689. The Court held that a six-month period of post-removal detention constitutes a "presumptively reasonable period of detention." Id. at 683; see also Clark v. Martinez, 543 U.S. 371, 377 (2005) ("[T]he presumptive period during which the detention of an alien is reasonably

//

1  necessary to effectuate his removal is six months . . . ."); Lema v. INS, 341 F.3d 853, 856 (9th Cir.

2  2003). Moreover, release is not mandated after the expiration of the six-month period:

3      This six-month presumption, of course, does not mean that every alien not removed
    must be released after six months. To the contrary, <u>an alien may be held in
4      confinement until it has been determined that there is no significant likelihood of
    removal in the reasonably foreseeable future</u>.

5

6  Zadvydas, 533 U.S. at 701 (emphasis added); see also Clark, 543 U.S. at 377.

7      The Supreme Court limited the statute, allowing an alien's post-removal-period detention "to

8  a period reasonably necessary to bring about that alien's removal from the United States." Zadvydas,

9  533 U.S. at 689. Zadvydas concluded that "once removal is no longer foreseeable, continued detention

10 is no longer authorized by statute." Id. at 699. Ultimately, "an alien can be held in confinement until

11 it has been determined that there is no significant likelihood of removal in the reasonably foreseeable

12 future." Id.

13     As the Ninth Circuit has recently emphasized, "Zadvydas places the burden on the alien to show,

14 after a detention period of six months, that there is 'good reason to believe that there is no significant

15 likelihood of removal in the reasonably foreseeable future.'" Pelich v. INS, 329 F.3d 1057, 1059 (9th

16 Cir. 2003) (quoting Zadvydas, 533 U.S. at 701); see also Xi v. INS, 298 F.3d 832, 840 (9th Cir. 2003).

17 The alien must make such a showing to shift the burden to the Government.

18     [O]nce the alien provides good reason to believe that there is no significant likelihood
    of removal in the reasonably foreseeable future, the Government must respond with
19     evidence sufficient to rebut that showing. And for detention to remain reasonable, as the
    period of prior post-removal confinement grows, what counts as the "reasonably
20     foreseeable future" conversely would have to shrink.

21 Zadvydas, 533 U.S. at 701.

22 <center>IV. ARGUMENT</center>

23     Petitioner cannot meet his burden and therefore his habeas petition should be dismissed without

24 prejudice. ICE is participating in ongoing negotiations with the Chinese Consulate and has previously

25 been successful in obtaining travel documents from China. Petitioner's case was recently elevated to

26 ICE Headquarters for a determination about his continued detention and about the extent to which the

27 U.S. will negotiate the issuance of his travel documents.

28 //

A. <u>Petitioner Cannot Show that His Removal Is Not Reasonably Foreseeable</u>

Petitioner has not sustained his burden to demonstrate that his repatriation is not significantly likely in the reasonably foreseeable future. ICE may continue to detain an alien for six months beyond the end of the removal period, <u>see</u> 8 U.S.C. § 1231(a))(1), unless the "alien provides good reason to conclude there is no significant likelihood of removal in the reasonably foreseeable future." <u>See</u> <u>Zadvydas</u> at 701. Once the alien makes such a showing, the burden is on the Government to rebut the showing. <u>Id.</u>

Petitioner's case does not implicate the impossibility of repatriation in <u>Zadvydas</u>. Zadvydas was stateless and both countries to which he potentially could have been deported (the country he was born in and the country that his parents were citizens of) refused to accept him because he was not a citizen. <u>See</u> <u>Zadvydas</u>, 533 U.S. at 684. The deportation of the other petitioner in <u>Zadvydas</u>, Ma, was prevented because there was no repatriation agreement between the United States and Cambodia. <u>Id.</u> at 685. The U.S. maintains a repatriation agreement with China and has been successful in repatriating Chinese citizens although on average it does take longer than most other countries. <u>See</u> Exh. D at ¶ 20.

Accordingly, Petitioner has not sustained his burden and it would be premature to reach that conclusion before permitting ICE headquarters an opportunity to complete its diligent efforts to obtain travel documents from China. The quest for Petitioner's travel documents is an emerging situation that has been progressing on a weekly basis. The Consulate interviewed Petitioner on February 20, 2008, and submitted a request for the issuance of his travel documents to mainland China on March 3, 2008. <u>Id.</u> at ¶¶ 13, 17. ICE sought status reports from the Chinese Consulate on March 17, 2008, April 3, 2008, and April 7, 2008. <u>Id.</u> at ¶ 18. Negotiations with the Consulate have continued, and on April 18, 2008, the Consulate communicated to ICE that it was hesitant to issue the travel documents because of Petitioner's ties to the United States. <u>See</u> Exh. P at ¶ 3. "[E]vidence of progress, albeit slow progress, in negotiating a petitioner's repatriation will satisfy <u>Zadvydas</u> until the petitioner's detention grows unreasonably lengthy." <u>Kim v. Ashcroft</u>, No. 02cv1524-J(LAB) slip op., at 7 (S.D. Cal. June 2, 2003) (finding that petitioner's one year and four month detention does not violate Zadvydas given respondent's production of evidence showing governments' negotiations are in progress and there is reason to believe that removal is likely in the foreseeable future). Exh. R.

B.    <u>Negotiations Are Ongoing With the Chinese Consulate That Has Consistently Issued Travel Documents to Chinese Citizens at ICE's Request</u>

<u>Zadvydas</u> recognized it was appropriate to grant the Government "appropriate leeway when its judgments rest upon foreign policy expertise" such as the status of repatriation negotiations. 533 U.S. at 700. In reviewing a determination by the Attorney General that there is a "significant likelihood of removal in the reasonably foreseeable future," a district court "must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to 'speak with one voice' in immigration matters." <u>Id.</u> The Court held that mere absence of an extant or pending repatriation agreement does not establish that "there is no significant likelihood of removal in the reasonably foreseeable future." <u>Id.</u> at 702. In such circumstances, a district court must give "due weight to the likelihood of successful future negotiations." <u>Id.</u>

ICE has successfully obtained travel documents from the Chinese Consulate for Chinese citizens. <u>See</u> Exh. D at ¶ 20. In this case ICE has diligently sought Petitioner's travel documents. <u>Id.</u> at ¶¶ 12-18. However, the process takes more time for China than for most other countries that successfully repatriate their citizens. <u>Id.</u> at ¶ 20. In Petitioner's case the process was lengthened when he was detained in Pennsylvania and then transferred to different ICE facilities in California. <u>Id.</u> at ¶ 8. The process was further frustrated when Petitioner informed the Chinese Consulate that he was going to try to reopen his deportation proceedings. <u>Id.</u> at ¶ 13. Once issued, travel documents to China are valid for three months. <u>Id.</u> Thus, from the Consulate's perspective there was no point in issuing travel documents if Petitioner was going to legally challenge the validity of his final deportation order.

Apart from whether ICE Headquarters determines that Petitioner is a "failure to comply" under 8 U.S.C. § 1231(a)(1)(C) (providing mechanism for suspension fo removal period when alien refuses to make a good faith application for travel documents or acts to prevent the alien's removal), Petitioner has not taken affirmative steps to obtain passage to China. His failure to do so raises the issue of whether his continued detention is voluntary. <u>See</u> <u>Cruz-Ortez v. Gonzales</u>, No. 06-55654, 2007 WL 580670 (9th Cir. Feb. 22, 2007) (finding alien was being voluntarily detained pending appeal of his final removal order). On April 28, 2008, the case was transferred to ICE Headquarters, who will decide

whether continued pursuit of the travel documents will result in Petitioner's removal in the reasonable foreseeable future given its past success in doing so.

      C.     Petitioner is a Flight Risk

In Zadvydas, the Court also recognized that the habeas court should measure reasonableness "primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal." Id. at 699. Petitioner is subject to an order of deportation that became final on March 24, 1997, when the BIA dismissed his appeal. See 8 C.F.R. § 1241.1 (an IJ order becomes final when the BIA dismisses the appeal of the order). Petitioner failed to surrender to ICE authorities after his deportation order was final and for more than ten years was a considered an immigration fugitive. See Antonio-Martinez v. INS, 317 F.3d 1089, 1093 (9th Cir. 2003) ("So long as a deportation order is outstanding, an alien has a heightened obligation to keep the INS apprised of his whereabouts so that it can take him into custody if an when the stay [of deportation] is lifted.").

On June 5, 2007, ICE officials came into contact with Petitioner and took him into custody to effect his deportation to China based on a March 24, 1997, final order of deportation. Petitioner's deportation has been delayed for more than ten years because he did not surrender himself to ICE authorities as required.[3] ICE has been actively trying to obtain travel documents for Petitioner's deportation to China. See Exh. D. ICE has determined that based on Petitioner's failure to surrender and fugitive status for ten years, it is necessary to continue to detain Petitioner which removal efforts continue. Now that the case is at ICE Headquarters, a determination will be made about whether continued negotiations with the Chinese Consulate will result in Petitioner's removal in the reasonably foreseeable future. At this time, the habeas petition should be dismissed without prejudice as the request for Petitioner's travel documents remains pending, negotiations with the Consulate are ongoing, and ICE has successfully obtained travel documents from the Consulate in the past.

---

[3] Petitioner comes before this court with unclean hands as his fugitive status taints his claims to equitable relief with bad faith. See Jarrow Formulas, Inc. v. Nutrition Now, Inc., 403 F.3d 829, 841 (9th Cir. 2002) . Further, Zadvydas does not apply where an alien who does not cooperate in good faith with government efforts of removal. See Pelich v. INS, 329 F.3d 1057, 1060 (9th Cir, 2003) (finding that an alien who did not cooperate in effectuating his removal is not protected by Zadvydas). Specifically, an alien who himself causes delay in removal proceedings cannot complain of the indefiniteness of his detention. Id.

IV.

CONCLUSION

For the reasons stated above, the Petition should be denied without prejudice.

DATED: April 28, 2008

          Respectfully submitted,

          KAREN P. HEWITT
          United States Attorney

          RAVEN M. NORRIS
          Assistant United States Attorney

          s/ Caroline J. Clark

          CAROLINE J. CLARK
          Assistant United States Attorney
          Attorneys for Respondents
          E-Mail: caroline.clark@usdoj.gov