**JANET C. TUNG**
California State Bar No. 231682
**FEDERAL DEFENDERS OF SAN DIEGO, INC**.
225 Broadway, Suite 900
San Diego, CA 92101-5008
Telephone: (619) 234-8467
Janet_Tung@fd.org

Attorneys for SUIHUAN CAO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE DANA M. SABRAW)**

| | |
|---|---|
| SUIHUAN CAO, | ) CASE No. 08-CV-0511-DMS (BLM) |
| Petitioner, | ) |
| | ) |
| v. | ) PETITIONER'S TRAVERSE |
| | ) (ORAL ARGUMENT REQUESTED) |
| MICHAEL CHERTOFF, et al., | ) |
| | ) |
| Respondents. | ) |
| ———————————————————— | ) |

1

**TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

3  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4  FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5    A.    The Government's Violation of Statutory and Regulatory Provisions Concerning Its
           Efforts to Seek Travel Documents and Conduct Custody Reviews . . . . . . . . . . . . . . . . . . 2
6

7    B.    The Chinese Consulate's Reluctance to Issue a Travel Document to Mr. Cao . . . . . . . . 3

8    C.    The Twelve Years Mr. Cao Spent Living at Home at the Address He Provided to
           Immigration Officials And Working at His Family's Chinese Restaurant . . . . . . . . . . . 5
9

   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
10
   I.    THE EXCESSIVE DETENTION OF MR. CAO HAS EXCEEDED THE SIX-MONTH
11         PRESUMPTIVELY REASONABLE PERIOD TWO TIMES OVER AND CONTINUED
           DETENTION VIOLATES HIS DUE PROCESS RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
12
13   A.    There Is No Good Reason to Believe Removal Is Likely in the Reasonable
           Foreseeable Future Because the Chines Consulate Is Unwilling to Issue Travel
14         Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15   B.    The Government Has Not Met Its Burden of Producing Rebuttal Evidence . . . . . . . . . . 9

16         1.    The Government's Assertions of Ongoing Efforts Fail to Meet the
                 Burden of Rebuttal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
17
           2.    The Government's Efforts Egregiously Violated Mr. Cao's Statutory and
18               Regulatory Rights And Were Not Remotely "Diligent" . . . . . . . . . . . . . . . . . . . . 13

19   C.    Mr. Cao Has Fully Cooperated with ICE's Removal Efforts . . . . . . . . . . . . . . . . . . . . . 15

20  II.   EVEN IF REMOVAL IS REASONABLY FORESEEABLE, DETENTION IS NOT
           JUSTIFIED BY ANY LEGITIMATE STATUTORY PURPOSE . . . . . . . . . . . . . . . . . . . . . . . 18

21   A.    Mr. Cao Is Not a Flight Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

22   B.    The Government Cannot Show That Mr. Cao Will Comit "Future Crimes" . . . . . . . . . 20

23  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

24  INDEX OF APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

25  PROOF OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

26  APPENDIX

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

Cruz-Ortiz v. Gonzales,
    2007 WL 580670 (9th Cir. 2007) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

He v. Gonzales,
    2006 WL 1687796 (W.D. La. 2006) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Kacanic v. Elwood,
    2002 WL 31520362 (E.D. Pa. 2002) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8,9,11

Lin v. Ashcroft,
    247 F. Supp. 2d 679 (E.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Liu v. Ashcroft,
    2004 WL 906294 (E.D. Pa. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Ma v. Ashcroft,
    257 F.3d 1085 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13,21

Ma v. Reno,
    208 F.3d 815 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Miller v. Gammie,
    335 F.3d 889 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Pelich v. INS,
    329 F.3d 1057 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Powell v. Ashcroft,
    194 F. Supp. 2d 209 (E.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Rajigah v. Conway,
    268 F. Supp. 2d 159 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,11,16

Rio Mar Associates, LP, SE v. UHS of Puerto Rico, Inc.,
    522 F.3d 159 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Sango-Dema v. INS,
    122 F. Supp. 2d 213 (D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Sembiring v. Gonzales,
    499 F.3d 981 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Seretse-Khama v. Ashcroft,
    215 F. Supp. 2d 37, 48 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Shefqet v. Ashcroft,
    2003 WL 1964290 (N.D. Ill. 2003) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Singh v. Gonzales,
    448 F. Supp. 2d 1214 (W.D. Wash. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Ulysse v. DHS,
    291 F. Supp. 2d 1318 (M.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14,19,20

United States v. Mendoza,
    2008 WL 1970339 (9th Cir. May 8, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Zadvydas v. Davis,
    285 F.3d 398 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Zadvydas v. Davis,
    533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Zhou v. Farquharson,
    2001 U.S. Dist. LEXIS 18239 (D. Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## DOCKETED CASES

Kim v. Ziglar,
    No. 02cv1524-J (LAB)) & . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Lun v. USINS,
    No. C02-0937L, 2002 WL 34202292 (W.D. Wash. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Negusse v. Gonzales,
    2007 WL 708615 (W.D. La. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Okwilagwe v. INS,
        No. 3-01-CV-1416-BD, 2002 WL 356758 (N.D. Tex. Mar. 1, 2002) . . . . . . . . . . . . . . . . . . . . . 7

## FEDERAL STATUTES

8 C.F.R. § 241.3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
8 C.F.R. § 241.4(g)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3,13,17
8 U.S.C. § 1231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,16,18
INA § 241(a)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## MISCELLANEOUS

ABA Model Rules 3.3(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# INTRODUCTION

Mr. Cao has been indefinitely detained in immigration custody, with no prospect of removal, since June 5, 2007—*for nearly one year*, twice the amount of time authorized by the Supreme Court in Zadvydas v. Davis, 533 U.S. 678 (2001). It is undisputed that Mr. Cao's removal order became final on March 24, 1997, *over eleven years ago*, when Mr. Cao was living at his present address, 7635 Overbrook Avenue, Philadelphia—and where he lived continuously for fourteen years until, in 2007, immigration officials descended on his home unannounced and imposed upon him the excessive detention he continues to endure. Not once in the eleven years since Mr. Cao's removal order became final did the government send him or his attorney the customary "bag and baggage" letter instructing him to surrender for deportation, or attempt to contact him in any other way—and the government makes no such claim. It is thus undisputed that Respondents have had *over eleven years* to put into motion the lawful mechanisms of effecting Mr. Cao's removal to China. See 8 U.S.C. § 1231.

Mr. Cao has more than met his burden of providing "good reason to believe" that there is no significant likelihood of removal in the reasonably foreseeable future—a "future" that has "shr[u]nk" to a very short period because his confinement has now far exceeded the Zadvydas six-month period. See Zadvydas, 533 U.S. at 701. Evidence now before the Court demonstrates that there exist well-documented institutional barriers  to Mr. Cao's removal to China: detailed studies conducted by the Department of Homeland Security reported empirical evidence of such barriers and have identified China as a country that "block[s] or inhibit[s] repatriation." See Petition at 5 & Appx. B. There are, moreover, particularized barriers to Mr. Cao's removal specifically, due to the Chinese Consulate's reluctance to issue travel documents in his case for "humanitarian reasons," as ICE Officer Eric Saldana candidly admits. See Ret. Exhs. at 68 (Decl. of Eric Saldana at ¶ 3).

The government has failed to rebut Mr. Cao's showing; its arguments that he must prove his eventual repatriation impossible and that the immigration agency's efforts alone—of which it made none until *7 days before the expiration* of the six-month Zadvydas period—are enough to justify detention have been squarely rejected by the Supreme Court and numerous other courts following Zadvydas. See, e.g., Zadvydas, 533 U.S. at 702 (overruling the Fifth Circuit's opinion holding that continued detention is "lawful as long as 'good faith efforts to effectuate . . . deportation continue' and [the alien] failed to show that deportation will

prove 'impossible.'").  Respondents should be ordered to release Mr. Cao under supervision forthwith. Should they eventually secure travel documents, they can find him exactly where he has lived for the past fourteen years: at 7635 Overbrook Avenue, Philadelphia, Pennsylvania 19151.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

The salient facts set forth in Mr. Cao's habeas petition are undisputed.  The government admits that it has had eleven years to remove Mr. Cao since his order of removal became final on March 24, 1997, and has not effectuated removal in those eleven years.  It also admits that it has been holding Mr. Cao in detention since June 5, 2007,[2] for over eleven months, and has not obtained from the Chinese government a travel document or any assurance that a travel document will issue.  See Ret. 3-4.  In fact, according to the government's own representations, it held Mr. Cao in detention for *five months and 23 days*—from June 5 until November 28—before it even made an effort to contact the Chinese embassy for a travel document. See Ret. 3 & Exhs. at 25-26 (Coronado Decl. ¶9).

**A.    The Government's Violation of Statutory and Regulatory Provisions Concerning Its Efforts to Seek Travel Documents and Conduct Custody Reviews**

As the government reveals in its petition, ICE did not even try to comply with its statutory and regulatory requirements to take timely and appropriate steps to seek a travel document.  The statutory removal period is 90 days.  See 8 U.S.C. § 1231(a)(1)(A); 8 C.F.R. § 241.4(g)(2).  Immigration and Customs Enforcement (ICE) did nothing to request a travel document before the statutory removal period expired on September 3, 2007.  See Ret. at 3.  It held Mr. Cao in detention for nearly three months beyond that 90-day statutory period before it bothered to contact the Chinese consulate for the first time, on November 28, 2007.  The presumptively reasonable period of detention under Zadvydas is six months; the first effort ICE made to request a travel document from the Chinese consulate was *seven days* before the six-month Zadvydas period expired.

---

[1]Mr. Cao incorporates by reference the factual background set forth in his petition, but provides here additional facts made available through A-file discovery provided by Respondents in the course of this action.

[2]Mr. Cao identified June 8, 2007, in his petition as the date his detention began. He acknowledges that the government may actually have been detaining him three days longer than he calculated, as its June 5, 2007, date may be correct.

1    Nor did it bother trying to comply with its detention review requirements.  ICE's own regulations

2    require it to conduct a custody review "[p]rior to the expiration of the [90-day] removal period."  8 C.F.R.

3    § 241.4(k)(1)(i).  No such review was conducted—a fact the government does not dispute.  See Petition at

4    3 (four months after the required review date and seven months into detention, ICE issued a "Decision"

5    purporting to retroactively justify its excessive detention).  The government offers no explanation for

6    disregarding Mr. Cao's statutory and regulatory rights, and, refreshingly, does not attempt to make excuses

7    for its malfeasance.  See generally Ret.  Instead, it candidly admits that instead of taking the necessary steps

8    to obtain a travel document, it spent the bulk of the 90-day period treating Mr. Cao like the subject of a

9    children's game of "hot potato," moving him from one facility to another until he arrived, 87 days into his

10   detention, at the San Diego Detention Facility (CCA), where he is now incarcerated.  See Ret. Exhs. at 25

11   (Coronado Decl. at ¶8); see also Declaration of Petitioner, filed concurrently herewith ("Cao Decl.") at ¶8.

12   The government also admits that it waited another 89 days—again, almost three months— after Mr. Cao

13   was transferred to the San Diego facility, within the jurisdiction of the local ICE officers, before contacting

14   the Chinese consulate.  See id. (Mr. Cao arrived at CCA on August 31, 2007; ICE contacted the embassy

15   on November 28, 2007).  Apparently, ICE officers spent five weeks reviewing Mr. Cao's A-file before

16   contacting the consulate.  See id.[3]

17   **B.    The Chinese Consulate's Reluctance to Issue a Travel Document to Mr. Cao**

18   Before the Court now is evidence that ICE faces institutional barriers to removing Mr. Cao to China,

19   a country known to block or inhibit repatriation, see Pet. at 5-6—a fact the government does not dispute—as

20   well as evidence that the Chinese consulate is blocking repatriation in Mr. Cao's particular case, as

21   presented in the government's own Return, "because of humanitarian factors."  Ret. at 4 & Exhs. at 68

22   (Saldana Decl. at ¶3).

23   The Chinese consulate will "not issue travel documents until ICE could verify that Petitioner was

24   not going to reopen his case."  Ret. at 3 & Exhs. at 26 (Coronado Decl. at ¶13).  The Chinese Consulate is

25

26   _____

27   [3]Officer Coronado's declaration states that his officer "received" the A-file "between October 22,
     2007 and November 28, 2007."  As this doesn't really make sense in context, Mr. Cao interprets this as a

28   typo meant to indicate that the A-file was received on October 22, and the officers "reviewed" it between
     the stated dates.

1  under the correct belief that, although there is no appeal or motion to reopen currently pending, Mr. Cao

2  intends to try to reopen his immigration case. <u>See</u> Cao Decl. at ¶11. Sometime in late February or early

3  March, Mr. Cao told Officer Young that undersigned counsel was helping him gain release from custody,

4  and after he was released, he would look for an immigration lawyer to help him reopen his case. <u>See</u> <u>id.</u>.

5  On February 25, 2008, undersigned counsel spoke with ICE Officer Pitt upon receiving his voicemail

6  message requesting a return call. <u>See</u> Tung Dec. at ¶3.[4] Undersigned counsel informed Mr. Pitt, upon his

7  inquiry, that there was no appeal or motion to reopen pending, and that she had no intent of filing a motion

8  to reopen, as the Federal Defenders of San Diego does not engage in the practice of immigration law. <u>Id.</u>

9  Undersigned counsel never claimed that no motion to reopen would ever be filed, and did not claim that

10  Mr. Cao had no desire to file such a motion. <u>See</u> <u>id.</u> at ¶3. Apparently, the following day, ICE contacted

11  the Chinese Consulate and may have made the false representation that "no petition to reopen was going

12  to be filed." <u>See</u> Ret. Exhs. at 27 (Coronado Decl. ¶ 16).[5]

13       At some point during the process, Mr. Cao's application was forwarded by the consulate to officials

14  in mainland China; however, the record contains no indication when this occurred—whether it was before

15  or after the consular official informed ICE that "he was still going to wait before issuing a travel document."

16  <u>See</u> Ret. Exhs. at 27 (Decl. ¶¶16-17) (on March 3, Officer Coronado, in what seems to be his first

17  conversation with the Chinese consulate about Mr. Cao, <u>see</u> <u>id.</u>, learned that the application had been

18  forwarded to China at an unspecified time). On March 13, undersigned counsel was informed by Chinese

19  Consular Officer Young that the Chinese consulate was still under the impression that legal actions in

20  Mr. Cao's immigration case had not completely terminated, and that the travel document request was still

21

22       [4]The government has not provided a declaration of Officer Pitt, but submitted instead representations

23  of an Officer "Miguel Coronado." <u>See</u> Ret. Exhs. at 24-27. Undersigned counsel has never corresponded
    with an Officer Coronado regarding this case on February 25 or any other date, only with Officer Pitt, who

24  was represented as the officer assigned to Mr. Cao's case. <u>See</u> Tung Decl. at ¶4. Notably, Mr. Coronado
    does not claim to have personally engaged in any of the telephone calls he describes in paragraphs 13-16

25  of
    his declaration.

26       [5]The accuracy of Mr. Coronado's statement that "[his] office" informed the consulate "that no

27  petition to reopen was going to be filed" is questionable. <u>See</u> Ret. Exhs. at 27 (Decl. at ¶16). This appears
    to be rank and unfounded hearsay, as Mr. Coronado does not claim to have personal knowledge of the call,

28  and does not identify his source of information.

in "pending" status. See Tung Decl. ¶5. Officer Young stated that he has no way of knowing how long the request would be pending. See id. Although Mr. Cao claims Chinese citizenship, there is no evidence in the record that the government of China has recognized him to be its citizen, or that a citizenship determination from mainland China is forthcoming. Neither is there any evidence that, should the mainland recognize Mr. Cao's claim to citizenship, the Chinese consulate will reverse its position on not issuing travel documents because of Mr. Cao's desire to file a motion to reopen and the stated humanitarian reasons. See Ret. at 3-4, Exhs. at 26-27, 68.

**C.**     **The Twelve Years Mr. Cao Spent Living At Home at the Address He Provided to Immigration Officials And Working at His Family's Chinese Restaurant**

During the entire time the government now claims Mr. Cao was a "fugitive," he was living at home with his family at 7635 Overbrook Avenue, Philadelphia, Pennsylvania 19151. See Cao Decl. ¶2; Declaration of Qing Cao ¶¶4-8 ("Qing Cao Decl.") (filed concurrently herewith). He worked full time at his parents' Chinese restaurant. Cao Decl. ¶2; Qing Cao Decl. ¶4. At all relevant times, and at least as early as April 4, 1994, immigration authorities were apprised of his whereabouts. See id. at ¶¶ 2-4. Mr. Cao's home address appears at the top of the bond document executed on April 7, 1994, which the government attached to its Return. See Ret. Exhs. at 29. Also on file with immigration authorities was a form titled "Notice to EOIR: Alien Address," dated April 7, 1994, and signed by an INS officer, which states:

> Upon release from INS custody, respondent reported his/her address and telephone number will be:
>
> c/o CAO, JIAN CHANG
> 7635 Overbrook Ave
> Phil[a]delphia, PA 19151

See Tung Decl. ¶6 & Exh. A. This "Alien Address" form, not included with the government's return despite its obvious relevance to refuting its "fugitive" accusation and this Court's order requiring the government to "include all documents relevant to the issues raised in the petition," see Order of the Court (filed March 21, 2008), was discovered by Mr. Cao's counsel in his A-file. See Tung Decl. at ¶6; see also id. at ¶7 & Exh. B (transcript of immigration hearing on June 2, 1995, at which Mr. Cao stated his 7635 Overbrook Ave address on the record).

//

1    Mr. Cao never received any communication, from the INS or anyone else, directing him to

2    report for deportation. Cao Decl. ¶5-6; Qing Cao Decl. ¶¶6-8.  The government does not claim that it sent

3    him or his attorney a "bag and baggage" letter or any other communication by mail or telephone, and it

4    cannot claim it lacked his address.  See Ret. at 3 (claiming only that INS sent a letter to "International

5    Fidelity Insurance Co." in 1999 asking that company to produce Mr. Cao).  Neither does it claim that

6    Fidelity Insurance Company conveyed its message to Mr. Cao.  Instead, on January 6, 2000, INS exonerated

7    the bond, informing International Fidelity Insurance Co. that the "conditions of [Mr. Cao's] bond have been

8    fulfilled . . . and you are no longer liable under such bond for this alien." Tung Decl. ¶8 & Exh. C ("Notice-

9    Immigration Bond Cancelled").  In early 2000, just a few months after the government failed to notify Mr.

10   Cao that it wished him to surrender on August 6, 1999, INS determined that his bond was "canceled," not

11   breached.  See id. at ¶9 & Exh. D.  INS notations indicate that the government had somehow "lost" the

12   bond. Id. at ¶10 & Exh. E.  As is clear from these documents, the INS actions in Mr. Cao's cases were not

13   exactly up to snuff.  INS failed to follow up on Mr. Cao's warrant of deportation.  ICE officers descended

14   upon his home not because they were looking for him—they were actually looking for someone else, a

15   former tenant—but then decided to arrest him instead of going home empty-handed.  See Ret. Exhs. at 50.

16   What is less clear is why, instead of owning up to the facts in its own file, the government opts instead to

17   label Mr. Cao a "fugitive" without even suggesting that he hid, fled, tried to escape detection, or even knew

18   that the INS wanted him to appear on a certain date.

19                                          **ARGUMENT**

20                                              **I.**

21   **THE EXCESSIVE DETENTION OF MR. CAO HAS EXCEEDED THE SIX-MONTH**
     **PRESUMPTIVELY REASONABLE PERIOD TWO TIMES OVER AND CONTINUED**
22   **DETENTION VIOLATES HIS DUE PROCESS RIGHTS**

23   The government may not continue to detain Mr. Cao because he has been in immigration

24   custody for over eleven months, nearly twice the six-month period held by Zadvydas to be presumptively

25   reasonable, and there is "good reason to believe there is no significant likelihood of removal in the

26   reasonably foreseeable future." Zadvydas, 533 U.S. at 701.  By the government's own evidence, Mr. Cao's

27   removal is not likely because the Chinese consulate is unwilling to issue travel documents due to Mr. Cao's

28   intent to reopen his immigration proceedings and humanitarian concerns.  See Ret. 3-4 & Exhs. at 26-27,

68. The government has also failed to rebut Mr. Cao's showing that there exist significant institutional barriers to timely repatriation of Chinese citizens, as documented by Congress as well as DHS. See Petition 5-6 & Apps. B & C (Apr. 2006 and Feb. 2007 DHS reports).

**A.**    **There is No Good Reason to Believe Removal Is Likely in the Reasonably Foreseeable Future Because the Chinese Consulate Is Unwilling to Issue Travel Documents**

The evidence of the Chinese consulate's unwillingness to issue a travel document far exceeds the very low showing Mr. Cao must make. Zadvydas created a sliding scale between the length of detention and Mr. Cao's burden of production. Where detention exceeds the six-month period, "what counts as the reasonably foreseeable future . . . [must] shrink." Zadvydas, 533 U.S. at 701 (quotation marks omitted); cf. Seretse-Khama v. Ashcroft, 215 F. Supp. 2d 37, 48 (D.D.C. 2002) (where three years had lapsed, "the lengthy period of petitioner's post-removal confinement has certainly caused the 'reasonably foreseeable future' to shrink to the point that removal must be truly imminent"). When an individual has suffered immigration detention for over "eleven months," as Mr. Cao has, reasonable foreseeability requires the government to "have documents in hand" permitting repatriation. See Seretse-Khama, 215 F. Supp. 2d at 50 (citing Okwilagwe v. INS, No. 3-01-CV-1416-BD, 2002 WL 356758, at *2-3 (N.D. Tex. Mar. 1, 2002)). It does not "have documents in hand," as Mr. Cao has shown. It does not even have a projected date or time frame of when it expects to receive such documents; quite the opposite, the Chinese consulate, by the government's own admission, is *not* likely to issue such documents. See Ret. 3-4.

Factors courts consider when applying Zadvydas' first step include: (1) the lack of "substantive indication regarding how or when [the government] expects to obtain the necessary travel document," Singh v. Gonzales, 448 F. Supp. 2d 1214, 1220 (W.D. Wash. 2006); (2) "the amount of time that the Petitioner has already spent in custody," Kacanic v. Elwood, 2002 WL 31520362, at *3 (E.D. Pa. 2002) (unpublished); (3) consular representations and inaction in the case at hand, see id., at *3; (4) admissions in official government reports concerning institutional difficulties with repatriation to the country at issue, see Negusse v. Gonzales, 2007 WL 708615, at *3 (W.D. La. 2007) (unpublished) (excerpt from the April 2006 DHS report, which set forth "the Government's own experience with Ethiopia confirm[ing] that Negusse's removal is not significantly likely to occur in the reasonably foreseeable future");(5) whether the petitioner has cooperated with ICE's efforts, see Singh, 448 F. Supp. 2d at 1220;

1   and (6) whether ICE has failed to make timely efforts at repatriation, see Seretse-Khama, 215 F. Supp. 2d

2   at 50.

3          Applying these factors here yields only one conclusion: there is no good reason to believe that

4   travel documents are "in hand" or will materialize in the very short period of time Zadvydas permits this

5   Court to consider.  As in Singh, Mr. Cao has shown that the government has no concrete measurement of

6   when a travel document might issue.  See 448 F. Supp. 2d at 1220.  In fact, by the government's own

7   admissions, the Chinese consulate has indicated that it is not likely to issue a travel document because of

8   Mr. Cao's desire to reopen his case, and because of its humanitarian concerns.  See Ret. Exhs. at 26, ¶13

9   ("The consular official stated they did not want to issue travel documents if Petitioner was going to reopen

10  his immigration case. . . ."); id. at 68, ¶3 ("the Consulate was hesitant to issue the travel documents because

11  of humanitarian factors relating to Mr. Cao").  Evidence that a country will not issue a travel document

12  "because of [the petitioner's] pending judicial proceedings," with or without the additional factors present

13  here, is "sufficient to satisfy petitioner's Zadvydas burden: it demonstrates that [China] is unlikely to take

14  petitioner back."  See Rajigah v. Conway, 268 F. Supp. 2d 159, 166 (E.D.N.Y. 2003).  Mr. Cao, like the

15  petitioner in Kacanic, has spent "almost double what the Court considered presumptively reasonable."

16  Kacanic, 2002 WL 31520362, at *3 (granting the petition).  Yet, in that time, the government has made no

17  substantive progress, and certainly cannot claim that issuance of travel documents are "imminent," see

18  Seretse-Khama, 215 F. Supp. 2d at 48.

19         Additionally, Mr. Cao has pointed to the evidence in the April 2006 DHS Report, "Detention

20  and Removal of Illegal Aliens,"—the same report cited in Negusse as evidence of "the Government's own

21  experience with [the country of removal]," 2007 WL 708615, at *3,—that there exist well-recognized

22  barriers to repatriation to China.  See Pet. at 5-6 & Apps. B & C.  Respondent DHS Secretary Chertoff has

23  also recently admitted that "the Chinese government is the worst at taking back its citizens and about 50,000

24  illegal immigrations are waiting to be returned to China."  See Appendix A.  Mr. Cao has, moreover, "fully

25  cooperated with ICE's efforts to obtain a travel document" since his detention began.  Singh, 448 F. Supp.

26  2d at 1220.  Certainly, Mr. Cao's showing is no less persuasive than the petitioner's in Kacanic, where the

27  Yugoslavia had all the information the petitioner could provide but "[had] even been unable to tell the INS

28  when a decision will be reached" and the government had "never offered any reason why obtaining travel

1   papers on this case has taken longer than normal." 2002 WL 31520362, at *3 ("Considering this lack of any

2   definitive answer, or any indication that a definitive answer is likely soon, there is no legitimate reason to

3   believe that removal will occur in the reasonably foreseeable future."). Here, like Kacanic, the Chinese

4   "officials have not indicated that removal will occur in this relatively short period of time." Id. at *3.

5           Finally, ICE bears the heavy burden of explaining its long delay in contacting the Chinese

6   embassy, and its distressing lack of effort to comply with Mr. Cao's statutory and regulatory rights. By its

7   own admission, ICE sat on its hands. It held Mr. Cao in detention for five months and 23 days, waiting until

8   just seven days shy of the end of the six-month Zadvydas period before it contacted the Chinese consulate

9   to seek a travel document. Cf. Seretse-Khama, 15 F. Supp. 2d at 50 (noting with disapproval that "the

10  efforts of [ICE] have been belated at best, and for long periods totally nonexistent"). In short, the

11  government "failed to make timely efforts to remove the Petitioner" and its "lack of effort only reinforces

12  the conclusion that the Petitioner's removal is not likely to occur in the reasonably foreseeable future."

13  Kacanic, 2002 WL 31520362, at *5. After it finally contacted the consulate on November 28, 2007, ICE

14  waited two months before it following up on its request—58 days after the Zadvydas period expired. See

15  Ret. Exhs. at 26, ¶ 12 (first follow-up was February 1, 2008). This unjustified delay after Mr. Cao's first

16  six months in detention hardly qualifies as "diligent," as the government has characterized its lackluster

17  efforts. See Ret. 7. To the contrary, the government's inaction was "especially egregious" and "reinforce[s]

18  the conclusion that removal in the near future does not seem likely." See Kacanic, 2002 WL 31520362, at

19  *5. Indeed, ICE's violation of its "statutory duty to effect removal within the 90-day period, if possible,"

20  prevents it from even asserting the authority to extend the removal period beyond 90 days. See Ulysse v.

21  DHS, 291 F. Supp. 2d 1318, 1324 & n.11 (M.D. Fla. 2003) (citing Xi v. INS, 298 F.3d 832, 840 n.6 (9th

22  Cir. 2002)).

23  **B.      The Government Has Not Met Its Burden of Producing Rebuttal Evidence**

24          The government has not provided "evidence sufficient to rebut" Mr. Cao's showing, see

25  Zadvydas, 533 U.S. at 701, but presents instead arguments that were squarely rejected by the Supreme

26  Court. The government's attempts at rebuttal amount to the arguments that Mr. Cao must prove "the

27  impossibility of repatriation," Ret. at 6, and that ICE's continuing efforts to seek a travel document are alone

28  enough to justify detention, see Ret. at 6-7 (claiming that "ICE has diligently sought Petitioner's travel

1  documents").

2  //

3      These are exactly the arguments relied on by the Fifth Circuit and overruled by the Supreme

4  Court after it granted certiorari in Zadvydas. See 533 U.S. at 702 (overruling the Fifth Circuit's holding that

5  continued detention is "lawful as long as 'good faith efforts to effectuate . . . deportation continue' and [the

6  alien] failed to show that deportation will prove 'impossible.'").  Instead of acknowledging the Supreme

7  Court's holding, the government claims that Mr. Cao must show his facts to be identical to the facts of the

8  petitioners in Zadvydas, see Ret. at 6[6]—in other words, that Zadvydas must be limited to its precise facts.

9  The government cites no authority for this novel position, and the Ninth Circuit has expressly held "that the

10  issues decided by the higher court need not be identical in order to be controlling." Miller v. Gammie, 335

11  F.3d 889, 900 (9th Cir. 2003) (en banc).

12      This Court need not be detained long.  The government's errant legal contentions fail to rebut

13  the fact that the Chinese consulate has stated that it is unwilling to issue a travel document because Mr. Cao

14  intends to file a motion to reopen and because of humanitarian reasons.  It has not, for example, claimed to

15  have travel documents "in hand," or identified a date certain, or even a general time frame, when a travel

16  document will be issued.  It has not scheduled a flight for Mr. Cao.  It does not claim that the Chinese

17  consulate at any point changed its mind about not issuing a travel document because of the impending legal

18  actions and humanitarian reasons.  Neither does it dispute Mr. Cao's evidence that China is well known to

19  "block" and "inhibit" repatriation.

20      **1.    The Government's Assertions of Ongoing Efforts Fail to Meet the Burden of Rebuttal**

21

22      The government claims only that, even in the face of Mr. Cao' substantial evidence that there

23

24      [6]Incidentally, in making its "identical facts only" argument, the government also misrepresents the

25  status of Zadvydas' removal in its claim that his removal was "impossibl[e]" because Lithuania "refused to accept him because he was not a citizen." Ret. at 6. Lithuania made no such conclusive determination.

26  See Zadvydas v. Davis, 285 F.3d 398 (5th Cir. 2002) (opinion on remand) (it "could *not* now be said with any real assurance that Zadvydas will never be deported" (emphasis in original, quotation marks omitted)).

27  Lithuania initially rejected his application as "inadequately documented"; subsequently, Zadvydas submitted a second application, which was "still pending" at the time of the Supreme Court's opinion. Zadvydas, 533

28  U.S. at 684.

1   exists no significant likelihood of removal in the reasonably foreseeable future, ICE's purportedly

2   "diligent[]" efforts at seeking travel documents are enough to meet its burden of rebuttal.  The government's

3   contention fails on the facts and the law.  Where "ICE merely asserts that it has followed up on its request

4   for travel documents from [the country of removal] and done all it can," its assertion "is not sufficient

5   evidence to rebut petitioner's showing that he is unlikely to be removed in the reasonably foreseeable

6   future." Singh, 448 F. Supp. 2d at 1220 (granting petition).  Generalized allegations that other individuals

7   have been removed in the past, moreover, fall short of the Zadvydas standard because they lack statistical

8   value and have no bearing on whether Mr. Cao will be removed.  See Rajigah, 268 F. Supp. 2d at 166-67;

9   cf. Seretse-Khama, 215 F. Supp. 2d at 50 ("respondents' figures [concerning how many individuals were

10  removed to Liberia] are ultimately of little real force unless one knows how many attempted removals to

11  Liberia were made each year"); Kacanic, 2002 WL 31520362, at *4 ("other aliens having been removed to

12  [China] in the past is not a credible indication that *this* alien will be removed in the near future").

13          Courts in numerous districts have rejected these arguments, even where the government has

14  provided more than the conclusory statements offered here.  In Rajigah, for example, in addition to the bare

15  allegations presented here that ICE "has been successful" with others in the past and is still trying now, see

16  Ret. at 6, the government also provided evidence that a travel document had previously actually been issued

17  to the petitioner and that it would file a demarché and threaten sanctions against Guyana, as well as send

18  that country evidence alleviating its humanitarian concerns.  268 F. Supp. 2d at 166-67.  Such assurances,

19  however, failed to satisfy the government's burden because they "do not provide any conclusive evidence

20  that petitioner will be removed in the near future." Id. at 167.  Rajigah held that "the fact that the Guyanese

21  government regularly issues travel documents and issued travel documents to the petitioner in the past

22  merely indicates that its general protocol is to issue travel documents, and that it must have a specific reason

23  why it will not issue travel documents to petitioner at this time." Id.; see also Lin v. Ashcroft, 247 F. Supp.

24  2d 679, 686 n.9 (E.D. Pa. 2003) ("statistics on the number of aliens who have been successfully removed

25  to a certain country may not itself demonstrate that an alien will likely be removed to that country in the

26  foreseeable future") (citing Kacanic, 2002 WL 31520362, at *4).  The result was the same in Shefqet v.

27  Ashcroft, 2003 WL 1964290, at *5 (N.D. Ill. 2003) (unpublished) ("Even if the INS has been making

28  regular efforts to secure Petitioner's travel document . . . at this time there must be some concrete evidence

1   of progress.  The INS cannot rely on good faith efforts alone."), and <u>Kacanic</u>, 2002 WL 31520362, at *4

2   (table provided by the INS lacked "individualized information" about any of the aliens who were deported

3   such as "criminal histories, how many of them were accepted despite having lived in the U.S. for more than

4   twenty years, or how many of them lacked a Yugoslavian passport," did not "allow for a meaningful

5   comparison of these removed aliens to the Petitioner's case," and therefore did "not give any indication or

6   whether or not the Petitioner will be removed in the near future").

7          The government's claim that evidence of "slow progress" "will satisfy <u>Zadvydas</u>" relies on

8   an unpublished and inapposite case where the petitioner failed to meet his burden of producing "credible,

9   admissible evidence."  <u>See</u> Ret. 6 (citing <u>Kim v. Ziglar</u>, No. 02cv1524-J(LAB) (S.D. Cal. June 2, 2003))

10  & Exhs. at 73.  <u>Kim</u> is factually off-point, and offers no support for the government's argument.  That

11  decision was also premised on a mistaken reading of <u>Zadvydas</u> that led the district court to believe that

12  "[t]he alien must allege something more than that there is no pending repatriation agreement." Ret. Exhs.

13  at 73.  The source of <u>Kim</u>'s confusion was an excerpt from <u>Zadvydas</u>, whose meaning was ambiguous when

14  taken out of context—specifically, the Supreme Court's decision to remand <u>Ma</u> (the companion case)

15  because the Ninth Circuit's decision to grant his petition "may have rested solely upon the 'absence' of an

16  'extant or pending' repatriation agreement without giving due weight to the likelihood of successful future

17  negotiations."  <u>Zadvydas</u>, 533 U.S. at 702.  What <u>Kim</u> took this to mean was that the absence of a

18  repatriation agreement would never be enough to meet a petitioner's burden of proof.  Its reading, however,

19  overlooked the second half of the quoted passage and the context from which it arose.

20         What the Supreme Court actually meant was that the Ninth Circuit should apply the burden-

21  shifting approach created by <u>Zadvydas</u> (and not employed by the Ninth Circuit in its pre-*certiorari*

22  decision), and determine whether its application affected the result.  The Ninth Circuit, in its first opinion

23  in <u>Ma</u>, appeared to give preclusive effect to the fact that there was no repatriation agreement.  <u>See</u> <u>Ma v.

24  Reno</u>, 208 F.3d 815, 828, 831 (9th Cir. 2000), <u>vacated sub nom by</u> <u>Zadvydas</u>, 533 U.S. at 702.  The

25  government, however, had presented some evidence that it was in negotiations with the Cambodian

26  government to establish a repatriation agreement—a fact that received scant mention in the Ninth Circuit's

27  first opinion.  <u>See</u> <u>Ma</u>, 208 F.3d at 831 (dismissing the evidence of negotiations because "both sides agree

28  that the United States has no functioning repatriation agreement with that country").  The Ninth Circuit's

1   original decision, although it applied the "reasonably foreseeable" standard adopted by the Supreme Court's

2   opinion in Zadvydas, did not anticipate Zadvydas' burden-shifting regime, and therefore did not separately

3   consider whether the government responded "with evidence sufficient to rebut [the petitioner's] showing."

4   Zadvydas, 533 U.S. at 701. Thus, the Supreme Court vacated and remanded Ma to allow the Ninth Circuit

5   to consider the negotiations testimony as "rebuttal" evidence under the new burden-shifting approach. See

6   id. at 702. The Ninth Circuit, on remand, carried out the Supreme Court's mandate by determining that

7   "there was insufficient showing that future negotiations were likely to lead to a repatriation agreement

8   within the reasonably foreseeable future," Ma v. Ashcroft, 257 F.3d 1085, 1099 (9th Cir. 2001)—in other

9   words, that "the Government [did not] respond with evidence sufficient to rebut [the Petitioner's] showing."

10  See Zadvydas, 533 U.S. at 701.

11  ### 2.   The Government's Efforts Egregiously Violated Mr. Cao's Statutory and Regulatory Rights And Were Not Remotely "Diligent"

12

13  In any event, the government's assertion that its efforts were "diligent" find not even the barest

14  factual support. Although it does not dispute the relevant timelines, the government makes no attempt to

15  explain why it made no effort to contact the Chinese embassy until it had detained Mr. Cao for 5 months

16  and 23 days. It does not explain why it violated its duty to "undertake appropriate steps to secure travel

17  documents for the alien . . . before . . . the expiration of the [90-day] removal period." 8 C.F.R.

18  § 241.4(g)(2). It does not explain why it waited until Mr. Cao had spent just 7 days short of the Zadvydas

19  six-month period before it sent its first letter to the Chinese embassy. It does not explain why it then waited

20  an additional two months after the Zadvydas period expired, until February 1, 2008, to follow up on its

21  initial request. At that time, when the government finally saw fit to contact the Chinese government for the

22  second time, Mr. Cao was suffering through his *eighth month* in detention. The government makes no claim

23  that it was *incapable* of carrying out its statutory and regulatory duties until it had forced Mr. Cao to endure

24  nearly six months of detention. Neither does it offer any explanation why it flouted its duty to conduct a

25  timely 90-day custody review, or, for that matter, why it failed to timely notify him of the warrant of

26  removal issued some nine years ago. Cf. Ulysse, 291 F. Supp. 2d at 1326 & n.13 (granting petition where

27  ICE "never attempted to contact [petitioner] or her former attorney regarding her removal" but instead

28  waited 17 months  after the removal order became final to employ "artifice and trickery" to effectuate arrest

1    and detention).

2         To view such flagrant disregard for its own regulations and Mr. Cao's rights as "diligent," Ret.

3    7, seems more fitting for an Orwellian tract than a legal brief.  ICE's actions here are far worse than  in

4    Kacanic, where the INS first contacted the Yugoslavian consulate three months after the removal period

5    began on November 8, 2001 (January 2, 2002), spoke with a consular one month later (February 15, 2002),

6    then waited three months to contact the consulate again (May 10, 2002).  See 2002 WL 31520362.  The

7    Court regarded the three-month delay between the February and May contacts to be "especially egregious"

8    because "the six-month presumptive period of detention had expired on May 8, 2002.  Id. at *5 & n.10

9    (finding that "[t]he INS failed to make timely efforts to remove the Petitioner").  By this standard, ICE's

10    entire course of action in Mr. Cao's case is "especially egregious" because it did nothing at all until the six-

11    month period nearly expired, then sat on it hands while it waited months before following up.  Such "lax"

12    efforts "in no way support the contention that petitioner's removal is significantly likely in the reasonably

13    foreseeable future."  Seretse-Khama, 215 F. Supp. 2d at 50; see also Ulysse, 291 F. Supp. 2d at 1326-27

14    (granting petition because ICE was without statutory authority to detain where it made no efforts to

15    effectuate removal within the 90-day period).

16         Even where the government has applied far greater diligence to obtaining a travel document

17    to China, its good faith actions unaccompanied by concrete evidence of results have been held to lack

18    persuasive value.  See Zhou v. Farquharson, 2001 U.S. Dist. Lexis  18239 (D. Mass. 2001) (unpublished)

19    (conditionally granting petition to Chinese national who had been in immigration custody for almost thirteen

20    in months where cabinet-level officials, "the Attorney General and Secretary of State[,] have approached

21    the government of China in order to expedite the issuance of travel documents for nations awaiting

22    removal").  Zhou recognized that even these good faith actions, "[g]iven the amount of time he has been

23    in detention [thirteen months] and the lack of assurances from the INS that the necessary paperwork from

24    China is currently on its way," offered "no reason to believe that he will be removed in the reasonably

25    foreseeable future."  Id. at *4 (recognizing that "Plaintiff's ever-increasing 13-month detention far exceeds

26    Zadvydas' presumptively constitutional six-month time limit").

27         There is, in sum, no escaping the fact that the result of ICE's eleven-month course of neglect

28    has been to obtain the Chinese consulate's representation that, while Mr. Cao's application was "pending"

1  in mainland China, it was unwilling to issue a travel document because Mr. Cao hoped to reopen his case

2  and because of humanitarian reasons—in other words, assurances that, unless this Court grants Mr. Cao's

3  petition, his unlawful detention will continue indefinitely.  Cf. Seretse-Khama, 215 F. Supp. 2d at 47 (even

4  though Liberian embassy "verified that subject is from Liberia," it would "not issue [a travel] document

5  because subject has no ties to Liberia and will become a public charge if returned").[7]  ICE Officer

6  Coronado's representation that, in the thirteen months he has been a Deportation Officer for ICE, he "ha[s]

7  not had a case where [the Chinese consulate] ha[s] not eventually issued [a travel document]," Ret. Exhs.

8  at 27, ¶20, does not, of course, change the analysis.  See supra at 11-12 (generalized claims to have

9  repatriated others in the past lack relevance to the particular case at hand).  Neither does it carry much

10  weight as to the actual practices of the Chinese government, even taken at face value.  The government

11  cannot and does not deny that, because of the difficulty of obtaining travel documents, ICE in fact releases

12  numerous Chinese nationals under supervision.  See, e.g., He v. Gonzales, 2006 WL 1687796 (W.D. La.

13  2006) (unpublished) (Zadvydas habeas petition of Chinese citizen rendered moot because ICE released him

14  from custody); accord Liu v. Ashcroft, 2004 WL 906294 (E.D. Pa. 2004) (unpublished) (court was "troubled

15  by the seeming inconsistency with which the Government treats deportation cases," noting that the

16  government "did not oppose the release of Mr. Zheng, an illegal Chinese Alien, pending deportation despite

17  the fact that he was convicted in federal court for violations of the Hobbs Act and for hostage taking" but

18  did oppose the release of a Chinese citizen who had never been convicted of any crime and had evidence

19  of employment and housing upon release).

20  **C.**　　　　**Mr. Cao Has Fully Cooperated with ICE's Removal Efforts**

21  　　　　The government's attempt to justify its unlawful detention by accusing Mr. Cao of "failure

22  to comply" and "volunt[eering]" to be detained, see Ret. 7, are without basis in law or reality.  Mr. Cao has

23  consistently cooperated with ICE deportation officials, and provided as much information as he was able

24  to, and the government does not contend otherwise.  See Cao Decl. ¶¶9-10 & Exh. A (giving extensive

25

26  　　　　[7]Here, mainland China apparently has not yet even verified Mr. Cao's citizenship, notwithstanding
the government's suggestion that "[t]here is no dispute that Petitioner is a Chinese citizen."  Ret. 1.  While

27  Mr. Cao certainly believe that he is a Chinese citizen, it is neither Mr. Cao's belief nor the government's
that controls.  What the government conveniently forgets to mention is that only the determination of the

28  Chinese government makes any difference to the issuance of a travel document.

1   contact information for numerous relatives); Ret. Exhs. at 58 (Mr. Cao "[c]ompleted Chinese passport

2   application). The baselessness of the government's claims are evident from the absence of any effort to

3   support its arguments with citation to legal authority and from its failure to identify a single "affirmative

4   step[] to obtain passage to China" that Mr. Cao should have done. See Ret. at 7.

5          Indeed, the government's arguments fall so far from the mark that "[i]t is important to

6   recognize what [ICE] is *not* claiming." Seretse-Khama, 215 F. Supp. 2d at 51 (rejecting the government's

7   argument). Here, as in Seretse-Khama, "Respondents do not argue that petitioner refused to request travel

8   documents or refused to be interviewed by [Chinese] officials." Id. Nor do they claim that he ever "denied

9   his [Chinese] citizenship"; "gave false or misleading information that impeded the issuance of travel

10  documents"; or failed to "truthfully answer[] the Consul's questions." Id. To the contrary, Mr. Cao's

11  actions have consistently demonstrated his willingness to cooperate, just like the petitioner in Seretse-

12  Khama. Here, as there, the government points to nothing more than the petitioner's "truthful (and somewhat

13  self-evident) statement" that he did not want to return to his country of origin, but instead wants to reopen

14  his immigration case. Id. at 51. Mr. Cao's "truthful statement (such as expressing that he did not wish to

15  return to his country of origin) which is later adopted by the country of origin as a reason for not wanting

16  to repatriate that alien, is not an example of refusal to cooperate under § 1231(a)(1)(C), and cannot be used

17  as grounds for extending post-removal detention." Rajigah, 268 F. Supp. 2d at 165 (citing Seretse-Khama,

18  215 F. at 50-53). "Failure to cooperate" simply is not implicated if "petitioner has not acted in bad faith."

19  Rajigah, 268 F. Supp. 2d at 165.

20         The argument the government advances here is the same one rejected by the Court in Seretse-

21  Khama and Rajigah, and relabeling it as "voluntary" detention does not change the analysis. See Rajigah,

22  268 F. Supp. 2d at 166 ("Respondents attempt to argue that during this period, petitioner was 'frustrating

23  his removal' because his counsel had advised the Guyanese Ambassador that he intended to file another

24  court action, and the Guyanese government had a policy of not issuing travel documents to its nationals who

25  file court actions."). There, as here, the government "cite[d] no case law . . . to support its argument that

26  such truthful communication to an embassy falls within the purview of § 1231(a)(1)(C)"; indeed, such a

27  circumstance "was deemed *not* to be an effort not to frustrate removal under § 1231(a)(1)(C)." Id. As

28  Rajigah and Seretse-Khama have held, Mr. Cao's intent to "avail[] himself of judicial process and [act of]

1   communicat[ing] to the [Chinese] embassy his plans to do so" totally fails to show the "bad faith" action

2   that the government alleges. See Rajigah, 268 F. Supp. 2d at 166. The government's citation to Cruz-Ortiz

3   v. Gonzales, 2007 WL 580670 (9th Cir. 2007) (unpublished), a three-sentence unpublished opinion

4   containing no analysis, is of no avail. The order of removal was not final in that case, whereas Mr. Cao's

5   order of removal has been final for over eleven years.

6       In any event, the government is foreclosed from asserting "failure to comply" because ICE has

7   never issued a "Notice of Failure to Comply" during Mr. Cao's removal period, as it is required to do in

8   order to assert a claim to extension of the removal period. See 8 C.F.R. §§ 241.4(g)(1)(ii) & (g)(5); see also

9   Singh, 448 F. Supp. 2d at 1219 (explaining in detail the regulatory prerequisite that ICE "shall serve the

10  alien with a Notice of Failure to Comply *before the expiration of the removal period*") (emphasis in

11  original). Here, the reason ICE has not served Mr. Cao with such a notice is obvious. He has not failed to

12  comply. Instead, he has filled out the forms provided him in excruciating detail and provided the

13  information available to him upon request. See Cao Dec. at ¶¶9-10 & Exh. A. No employee, agent, or

14  officer of ICE has ever indicated that Mr. Cao has "failed to comply." Tellingly, the government's Return

15  does not identify a single thing Mr. Cao should have done but did not do, nor does it claim that Mr. Cao has

16  taken any action in bad faith. The government makes no claim, for example, that Mr. Cao has lied about

17  his place of birth and refused to fill out a passport application, as in Pelich v. INS, 329 F.3d 1057, 1059 (9th

18  Cir. 2003), gave a false name, as in Powell v. Ashcroft, 194 F. Supp. 2d 209, 210-11 (E.D.N.Y. 2002), or

19  refused to communicate with consular officials, as in Sango-Dema v. INS, 122 F. Supp. 2d 213, 221 (D.

20  Mass. 2000).

21      Although the government has not bothered to identify to the Court these—or any—"failure

22  to comply" cases, its omission is not because such published opinions do not exist. They do; Pelich, Powell,

23  and Sango-Dema are but a few examples.[8] What these cases show is that there is not even the slimmest

24

25      [8]It would require a fertile imagination to plausibly suggest that none of the three government
26  attorneys listed on the caption of the Return was aware of these cases. Pelich originated in this district and
    was handled by the very same U.S. Attorney's office handling this case, and Powell and Sango-Dema are
27  cited by Pelich. See 329 F.3d at 1060-61. Although the government's omission of these cases, which are
    directly adverse to its "failure to comply" claim, amounts to a facial violation of Rule 3.3(a)(2) of the ABA
28  Model Rules of Professional Conduct, its decision smacks more of halfheartedness than deliberate

factual basis to suggest that Mr. Cao has behaved in a remotely comparable manner to the petitioners in those cases—which may explain why the government shies so far from the case law in formulating its argument. See Return at 7-8 (citing no "failure to comply" cases). Indeed, government counsel seems to be taking a stance at odds with her own clients' position: ICE itself has never claimed here to be detaining Mr. Cao for refusing to assist in his removal, and has not undertaken the regulatory notification steps prerequisite to asserting such a claim. See Ret. at 7 (framing its "failure to comply" argument as viable regardless of "whether ICE Headquarters determines" he is).[9]  As the record makes clear, government counsel's newly-minted claim of "failure to comply" altogether lacks support, and, moreover, is contradicted by the position taken by ICE to date.  Moreover, as Singh makes clear, the government is legally foreclosed from attempting to justify detention on "failure to comply" grounds where it has not issued a "Notice of Failure to Comply" within the removal period.  See 448 F. Supp. 2d at 1219 (granting the petition and ordering petitioner released).[10]  The government should be ordered to release Mr. Cao to his home in Philadelphia immediately.

## II.

**EVEN IF REMOVAL IS REASONABLY FORESEEABLE, DETENTION IS NOT JUSTIFIED BY ANY LEGITIMATE STATUTORY PURPOSE**

Mr. Cao maintains that his removal is not foreseeable, and he must therefore be immediately released under supervision.  See Zadvydas, 533 U.S. at 699-700.  But even if this Court finds that there exists a significant likelihood that Mr. Cao will be removed in the reasonably foreseeable future, the government must prove that continued detention is necessary to fulfill the § 1231's purposes of "assuring

---

misleading of the tribunal.

[9]The government's argument in this regard is hardly a paragon of clarity; one hopes that the government's failure to state explicitly to the Court that ICE has not, in fact, determined Mr. Cao to have taken bad faith actions under § 1231(a)(1)(C)—while at the same time arguing that he should be treated as such—arises from inartful drafting rather than a want of candor.

[10]Ironically, by arguing in its briefing now that Mr. Cao is a "failure to comply" case, government counsel is asking this Court to find that its own client—ICE—"failed to comply with its own regulations when it purported to extend petitioner's detention pursuant to INA § 241(a)(1)(C) without issuing a Notice of Failure to Comply within the 90-day removal period."  Singh, 448 F. Supp. 2d at 1219.

1 the alien's presence at the moment of removal" or "the risk of the alien's committing further crimes." See

2 id.; see also Lun v. USINS, No. C02-0937L, 2002 WL 34202292 (W.D. Wash. 2002) ("even where removal

3 is reasonably foreseeable, the habeas court should consider the alien's flight risk and the risk he poses to

4 the community to determine whether confinement during the reasonable removal period is justified") (citing

5 Zadvydas, 121 S. Ct. at 2499, 2504).  This it cannot do.

6 **A.        Mr. Cao Is Not a Flight Risk**

7              Detention is wholly unnecessary to assure that Mr. Cao appear for deportation, should a travel

8 document ever issue.  He was previously granted release on bond, and never violated any of the bond

9 conditions.  See Cao Decl. ¶2.  He appeared at immigration hearings while out on bond, and would have

10 appeared to surrender himself if he had ever been notified.  Id. ¶6.  Mr. Cao has not absconded or failed to

11 attend any duly noticed court appearance.  There is no evidence to suggest that he would not duly appear

12 for deportation should he be released now.

13             Mr. Cao is not a flight risk.  The government's claim that he is a "fugitive" fails to pass even

14 the straight-face test.  A "fugitive" is a "person who flees or escapes" or a "criminal suspect who flees,

15 evades, or escapes arrest, prosecution, or imprisonment, esp. by fleeing the jurisdiction or by hiding."

16 Black's Law Dictionary, edited by Bryan A. Garner (7th ed. 1999).  Mr. Cao has not fled; he has not evaded

17 or escaped arrest, fled the jurisdiction, or engaged in hiding—and the government does not claim that Mr.

18 Cao has done any of those things.  Quite the contrary.  Mr. Cao lived at home for fourteen years while the

19 INS in its bureaucratic wisdom chose not to send him a letter or pick up the telephone to inform him of the

20 date it wished him to appear, and while it proceeded to "lose" his bond and later relieve the surety of any

21 financial obligation.  See Tung Decl. ¶10 & Exh. E.  Mr. Cao did not change his address; he lived at the

22 same 7635 Overbrook Avenue house that the INS (and its successor agency) had on record several times

23 over.  See Cao Decl. ¶¶ 2-7; Qing Cao Decl. ¶4; Tung Decl. ¶¶ 6-7 & Exhs. A-B.  The government does

24 not contest any of these facts.  To the contrary, it informed the surety on Mr. Cao's bond that he had

25 "fulfilled" the "conditions of the . . . immigration bond" and the surety would "no longer liable under such

26 bond for this alien," and canceled the bond. Tung Decl. ¶8 & Exh C; accord 8 C.F.R. § 241.3(b) ("Any bond

27 previously posted will be canceled unless it has been breached or is subject to being breached.").

28             Thus, calling Mr. Cao a "fugitive" is absurd.  It is also without basis in any good faith reading

1    of the law.  The government cites no authority to support its position imputing to Mr. Cao the clairvoyance

2    of knowing he was supposed to appear for deportation without ever being so notified.  Neither does the

3    government cite any authority to suggest that it may now brand as a "fugitive" and punish through excessive

4    detention an individual whom it *never even attempted to serve notice on*.  See Ret. (government nowhere

5    claims any attempt at contacting Mr. Cao regarding its alleged surrender date).  No such authority

6    exists—not in this world, at least.  See Rio Mar Assocs., LP, SE v. UHS of Puerto Rico, Inc., 522 F.3d 159,

7    164 (1st Cir. 2008) ("The law does not require parties to possess . . . clairvoyance.").  The government's

8    unfounded mud-slinging seems a transparent ploy designed to deflect from its own negligence and

9    ineptitude, and perhaps as a preemptive maneuver to prevent rightful recovery of the "lost" bond.  See Tung

10   Decl. ¶10 & Exh. E (describing bond as "lost" and informing the surety that "[t]he conditions of the . . .

11   bond have been fulfilled").  Accord Sembiring v. Gonzales, 499 F.3d 981, 989 (9th Cir. 2007) (granting

12   petition and holding that motion to reopen was wrongly denied where the government presented "weak"

13   evidence that its notification of a hearing date "was actually mailed" to the petitioner at her address in

14   Mission Viejo).  The government bore the burden of contacting him, but neglected to do so.  Cf. United

15   States v. Mendoza, – F. 3d. –, 2008 WL 1970339 (9th Cir. filed May 8, 2008) ("[I]f the defendant is not

16   attempting to avoid detection and the government makes no serious effort to find him, the government is

17   considered negligent in its pursuit.").

18   **B.**          **The Government Cannot Show That Mr. Cao Will Commit "Future Crimes"**

19          The government does not claim in its Return to justify Mr. Cao's detention on the ground that

20   he presents a "risk of committing future crimes."  See Zadvydas, 533 U.S. at 699.  Mr. Cao presents no such

21   risk.  Even taking ICE's unsupported representations as true, for the sake of argument, Mr. Cao has not

22   suffered a criminal conviction in over ten years.  He has had a stable residence and employment in the past

23   decade, and there is no evidence to suggest that, contrary to the strong showing of rehabilitation, he is likely

24   to commit crimes upon release.  He has too much at stake.  He has two young children who need him, and

25   he will be helping his family financially and caring for his father, who was diagnosed last month with

26   pancreatic cancer.  Cao Decl. ¶12 & Exh. B; Qing Cao Decl. ¶¶9-10.  Mr. Cao's father needs him to help

27   during his period of convalescence following the May 29 surgery scheduled to remove his 10 cm tumor.

28   Id.  The government's inaction for eleven years amounts to a concession that it does not regard Mr. Cao to

1   be a flight risk or a danger to society.  See Ulysse, 291 F. Supp. 2d at 1326 & n.13 ("Obviously,

2   Respondents have no concern that Ulysse is a flight risk or a danger to society because they made no effort

3   to remove or detain her sooner.").

4        In sum, evidence of the unlawfulness of continued detention is overwhelming.  In addition to

5   all of the reasons given above, the "arbitrary arrest and detention" Mr. Cao has been subjected to violates

6   international law.  See Ma, 257 F.3d at 1114.  The Charming Betsy rule does not permit the immigration

7   statutes to be construed in a way that authorizes Mr. Cao's continued detention.  See id. (citing Murray v.

8   The Charming Betsy, 6 U.S. (2 Cranch) 64, 117-18 (1804)).  Mr. Cao should be released under supervision

9   forthwith.

10                                       **CONCLUSION**

11       For the reasons set forth above, in the Petition for Writ of Habeas Corpus, and the pleadings

12  and documents on file in this case, Mr. Cao's Petition should be granted forthwith.  In the alternative, the

13  Court should issue a conditional writ ordering Mr. Cao's release under supervision if Respondents have not

14  removed him from the country within 10 days. Should the Court be inclined not to grant the petition,

15  Mr. Cao requests an evidentiary hearing to be held as soon as reasonably possible.  Mr. Cao also requests

16  oral argument before the Court.

17

18                                          Respectfully submitted,

19  Dated: May 19, 2008                     /s/ JANET C. TUNG
                                            **Federal Defenders of San Diego, Inc.**
20                                          Attorneys for SUIHUAN CAO
                                            Email:  Janet_Tung@fd.org
21

22

23

24

25

26

27

28

1

INDEX TO ATTACHMENT

2

APPENDIX A          HOMELAND SECURITY CHIEF SAYS CHINA, OTHER COUNTRIES BLOCK
                         DEPORTATIONS

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SUIHUAN CAO, | ) | CASE No. 07-CV-0511-DMS (BLM) |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | PROOF OF SERVICE |
| | ) | |
| MICHAEL CHERTOFF, et al., | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |

I, the undersigned, say:

1) That I am over eighteen years of age, a resident of the County of San Diego, State of California, and not a party in the within action;

2) That my business address is 225 Broadway, Suite 900, San Diego, California, 92101;

3) That I served the within TRAVERSE via ECF/NEF and caused to be delivered a true and correct copy of the above-mentioned document to:

KAREN P. HEWITT
ATTN: Civil Processing Unit
880 Front Street
San Diego, CA 92101

and

4) That I caused to be delivered a courtesy copy to Chambers of the Honorable Dana M. Sabraw.

I certify under the laws of the State of California that the foregoing is true and correct. Executed on 19 May 2008 at San Diego, California.

/s/ JANET C. TUNG
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, CA 92101
PH: (619) 234.9467
Email: Janet_Tung@fd.org